Argued January 6, affirmed February 10, petition for rehear-
ing denied March 8, 1960

SHOEMAKER *v.* SELNES ET AL

349 P. 2d 473

*R. W. PicKell,* Salem, argued the cause and filed briefs for appellant.

*T. W. Churchill,* Salem, and *Manley B. Strayer,* Portland, argued the cause for respondents. With them on the brief were E. L. Crawford, Salem, R. H. Huntington and Hart, Rockwood, Davies, Biggs & Strayer, Portland.

Before McALLISTER, Chief Justice, and SLOAN, O'CONNELL and HARRIS, Justices.

HARRIS, J. (Pro Tempore)

This is an action for malicious prosecution. After the plaintiff rested his case, the court sustained the motions of defendants Arnold Selnes, Jens Svinth, and G. Carroll Meeks for judgment of involuntary nonsuit. The court also sustained the motion of defendant The United States National Bank of Portland for a directed verdict in its favor after the latter had rested its case without presenting evidence. From a judgment based on said rulings, the plaintiff appeals.

The plaintiff, Jack A. Shoemaker, was the president and principal stockholder of Washington Creamery Co., a corporation (hereinafter referred to as the processor), located in Silverton, Oregon, and engaged in the marketing and processing of turkeys. Defendant Arnold Selnes (hereinafter referred to as the grower) was a turkey grower.

In December, 1954, the grower turned over certain turkeys to the processor. This transaction and the financial arrangements which draw the defendant bank and its officers, the defendants Svinth and Meeks, into the picture are fully set forth in the related case of *Montgomery v. United States National Bank et al.*, decided this day.

Subsequent to the transaction mentioned in the foregoing paragraph, on March 16, 1955, a criminal action was instituted against the plaintiff in the district court of Marion county, Oregon, upon a complaint sworn to by the defendant Arnold Selnes, charging the plaintiff with the crime of embezzlement by bailee of the turkeys in question. After a preliminary hearing, plaintiff was bound over to the grand jury

and later indicted by that body. Plaintiff was subsequently tried on this indictment in the circuit court in June, 1955, and was acquitted by the jury.

The principal assignments of error complain of the court's rulings in sustaining the respective motions of the defendants above referred to and in refusing to admit into evidence certain material hereinafter mentioned.

The record indicates that the trial court allowed the motions for nonsuit and directed verdict principally upon the grounds that plaintiff had failed to prove that the criminal proceedings were instituted against the plaintiff without probable cause, and that plaintiff was actually guilty of the offense for which he was prosecuted.

■ The elements of a cause of action for malicious prosecution are:

"(1) A private person who initiates criminal proceedings against another *who is not guilty of the offense charged* is liable to him for the harm done thereby if the proceedings

"(a) were initiated
(i) without probable cause, *and*
(ii) primarily because of a purpose other than that of bringing an offender to justice, and

"(b) A private person who procures the institution of criminal proceedings against another is liable under the conditions stated in Subsection (1)." 3 Restatement 382, Torts § 653. (Emphasis supplied.)

See also 34 Am Jur 703, Malicious Prosecution § 2; 706, § 6; 707, § 8; 715-716, § 22.

It thus appears that plaintiff must not only prove that the prosecution was instituted because of an improper purpose (other than that of bringing an of-

fender to justice), but must also prove as an additional element that the proceedings were initiated without probable cause. 3 Restatement 382, Torts § 653; id. 404, § 662; id. 423, § 668; 34 Am Jur 729, 731, Malicious Prosecution § 46.

■ Moreover, in order to recover, plaintiff must not have been guilty of the offense charged. 3 Restatement 382, Torts § 653; id. 390, § 655; 34 Am Jur 741, Malicious Prosecution § 58; 747, § 70; 788-789, § 147.

■ For the moment we will pass the question of upon whom lies the burden of proof with reference to the last-stated matter. However, the fact that the person against whom a criminal proceeding is instituted is actually guilty of the crime charged against him is a complete defense against liability for instituting or pressing such proceeding. Under this rule the guilt or innocence of the person accused in a criminal proceeding may be retried despite the termination of those proceedings in his favor. This is so even though the accused was acquitted after trial by a verdict of not guilty. 3 Restatement 393, Torts § 657; *Meyer v. Nedry,* 159 Or 62, 67, 78 P2d 339; *Eastman v. Monastes,* 32 Or 291, 51 P 1095.

■ In fact, the acquittal in the criminal case is not even prima facie evidence of want of probable cause for the prosecution. *Eastman v. Monastes,* supra, at p. 297; 34 Am Jur 740-741, Malicious Prosecution § 58.

■ It must be remembered a verdict of not guilty in a criminal proceeding is not necessarily a finding the accused was innocent. It may, and often does, mean no more than that the jury were not convinced of his guilt beyond a reasonable doubt. 3 Restatement 393,

Torts § 657; 34 Am Jur 740, Malicious Prosecution § 58.

■ Let us now turn to the question of probable cause. 3 Restatement 403, Torts § 662, sets forth the elements of probable cause as follows:

"One who initiates criminal proceedings against another has probable cause for so doing if he

"(a) reasonably believes that the person accused has acted or failed to act in a particular manner, and

"(b)

(i) correctly believes that such acts or omissions constitute at common law or under an existing statute the offense charged against the accused, or

(ii) mistakenly so believes in reliance on the advice of counsel under the conditions stated in § 666."

■ From the foregoing we note that if one who initiates a criminal proceeding reasonably believes that the person accused has acted in a certain manner and correctly believes that such act constitutes the offense charged, the accuser has probable cause for his initiating the criminal proceedings.

"* * * 'probable cause' comprehends the existence of such facts and circumstances that would excite in a reasonable mind the honest belief that the person is guilty of the crime charged * * *," *Drake v. Anderson*, 68 Or Adv Sh 101, 104, 215 Or 291, 334 P2d 477; *Engelgau v. Walter*, 181 Or 481, 489, 182 P2d 987.

"Want of probable cause is the gist of the action. Its nonexistence must be pleaded and proven if plaintiff is to prevail. *White v. Pacific Tel. & Tel. Co.*, 162 Or 270, 273, 90 P2d 193." *Drake v. Anderson*, supra, at p 103.

■ The acquittal of the accused by the jury is not

evidence of lack of probable cause. *Meyer v. Nedry,* supra. It is not even prima facie evidence of want of probable cause. *Engelgau v. Walter,* 181 Or 481, 492, 182 P2d 987.

> "c. The fact that the accused was acquitted after trial by a magistrate or court is properly regarded as immaterial in determining the existence or nonexistence of probable cause. The existence of probable cause depends upon the accuser's reasonable belief in facts which, if true, would justify his belief in the guilt of the accused, while an acquittal by a magistrate or court merely shows that the evidence produced at the trial was not sufficient to remove all reasonable doubts as to the guilt of the accused." 3 Restatement 422, Torts § 667.

Having stated the principles of law applicable to probable cause, we must now determine the function of the court and jury in passing upon and determining this necessary element in an action for malicious prosecution.

In *Kuhnhausen v. Stadelman,* 174 Or 290, 310-311, 148 P2d 239, 149 P2d 108, this court, speaking through Mr. Justice Lusk, held:

> "It is a firmly established rule in this state that in actions for malicious prosecution the question of probable cause is a question of law which the judge must decide upon established or conceded facts. If none of the facts are in dispute, the court must decide the case without the intervention of a jury; but, if the case cannot be so decided, it must go to the jury with instructions from the court that certain facts, if found by them to exist, do or do not constitute probable cause; and it is not competent for the court to give to the jury a definition of probable cause and instruct them to find for or against the defendant

according as they may determine that the facts are within or without that definition."

In other words, where the facts or circumstances under which defendant acted are in dispute, such issue must go to the jury with instructions from the court that certain facts, if found to exist, do or do not constitute probable cause. However, if there is no conflict in the evidence the question of probable cause is a question of law for the court. 3 Restatement 434, Torts § 672. Where there is no conflict in the evidence as to what the circumstances were, the court solely must determine the question of lack of probable cause. Id. 437-438, § 673. Plaintiff has the burden of persuading the court that the circumstances under which the defendant acted did not give him reasonable cause for initiating the criminal proceedings. *Drake v. Anderson,* supra, p 103; 3 Restatement 434, Torts § 672.

"* * * If there is no evidence whatever from which the jury might have inferred that the defendants did not in fact believe that a crime had been committed and that plaintiff had committed it, the question of defendants' belief is to be determined by the court on the basis of what, under the circumstances, was sufficient to cause a reasonable man to entertain a suspicion that the crime had been committed and that plaintiff had committed it. Franzen v. Shenk, 192 Cal. 572, 578, 581, 582, 221 P. 932; Haydel v. Morton, 8 Cal.App.2d 730, 733, 48 P.2d 709." *Centers v. Dollar Markets,* 99 Cal App2d 534, 22 P2d 136, 142.

The bindover at the preliminary hearing and the grand jury indictment are prima facie evidence of probable cause. *Hryciuk v. Robinson,* 213 Or 542, 551, 326 P2d 424; *Thienes v. Francis,* 69 Or 165, 169, 138 P 490.

The crime charged against defendant (plaintiff here) in the criminal proceedings was a violation of ORS 165.010, which reads as follows:

"(1) Any bailee, with or without hire, including every mortgagor of personal property having possession of property mortgaged, or any purchaser or lessee of personal property obtaining the possession thereof under a written or printed contract of conditional sale providing that title thereto shall not vest in the purchaser until the unpaid balance of the purchase price is wholly paid for, and before it is wholly paid for, who embezzles or wrongfully converts to his own use, or secretes or conceals with intent to convert to his own use, or injures, destroys, sells, gives away or removes from the county where situated when obtained, without the written consent of the bailor or vendor, or fails, neglects or refuses to deliver, keep or account for, according to the nature of his trust, any money or property of another delivered or intrusted to his care, control or use, which is property within the meaning of ORS 164.310, shall be deemed guilty of larceny and shall be punished as provided in ORS 164.310.

"(2) If any such bailee receives grain of any kind from different bailors and mixes and stores it together in bulk, in an indictment charging him with committing, with reference to said grain, the crime defined and made penal in this section, it is not necessary to charge in the indictment or prove on trial that ownership of said grain is in more than one bailor."

■ It has been expressly held by this court that an intent to defraud is not a necessary ingredient of the crime with which defendant was charged in the criminal proceedings.

"Section 1956 of the statute does not expressly make an intent to defraud a necessary ingredient of the crime charged in the indictment. A wrongful conversion of money of another intrusted to a

bailee or a failure, neglect or refusal to deliver, keep, or account for such money according to the nature of the trust would be a violation of the statute: *State v. Ross,* 55 Or. 450 (104 Pac. 596, 106 Pac. 1022, 42 L.R.A. (N.S.) 601, 613); *Purcelly v. State,* 29 Tex. App. 1 (13 S.W. 993); 25 Cyc. 98b. In other words, if Chapin was the bailee of the $3,500, the property of Mr. and Mrs. Grace, and wrongfully converted the same to his own use and failed to account for or deliver the same according to the nature of his trust, he would violate the statute, although at the time he appropriated the money he may have intended to speculate therewith and repay the same at some future time." *State v. Chapin,* 74 Or 346, 356-357, 144 P 1187.

In contending the issue of probable cause was a question of fact for the jury, the plaintiff argues as follows:

"Plaintiff contends that to show want of probable cause, as one of the elements of the complaint, it was necessary to show only the facts of the transaction of the 1468 turkeys, which plaintiff did show, that the transaction was a sale at all times, that the facts were known to defendants and therefore defendants knew at the time when the complaint was signed that plaintiff was not guilty of embezzlement. Such would overcome the effect of the bindover and indictment."

Again, plaintiff's position is set forth as follows:

"Sale to Washington Creamery, Inc. of said 1468 turkeys occurred at the time said turkeys were delivered to Washington Creamery, Inc. That is plaintiff's position."

It thus appears that plaintiff relies upon the position that the transaction consisting of turning over the turkeys (fully set forth and described in *Montgomery v. United States National Bank et al.*) was a sale and not a bailment. Plaintiff has addressed no

argument to this court based upon the assumption that the transaction was a bailment. However, this court held on similar basic and determinative facts, not necessary to again review here, in Montgomery that the transaction was, as a matter of law, a bailment and that the hypothecation and pledging of the turkeys constituted a wrongful conversion thereof. We make a similar holding in this case. We also hold that the wrongful conversion condemned by ORS 165.010 is no different in kind or degree from the conversion we determined, as a matter of law, occurred in Montgomery.

■ The evidence discloses that before the criminal charge was initiated defendant Selnes learned that the turkeys had been pledged and hypothecated without his authority and without his knowledge. It now appears that such acts constituted a violation of an existing statute, ORS 165.010. Therefore, we hold, as did the trial court, that plaintiff has failed, as a matter of law, to prove an essential ingredient of malicious prosecution, lack of probable cause. On the contrary, we hold as a matter of law that the defendant Selnes had probable cause to institute the criminal proceedings.

Moreover, the record shows, under legal principles heretofore discussed, that as a matter of law plaintiff did commit the offense charged in the criminal proceedings. This again shows the existence of probable cause and is a complete defense to the instant action. Prosser, Torts (2d ed) 651-652, § 98; 34 Am Jur 788-789, Malicious Prosecution § 147.

Plaintiff contends that guilt of the offense charged is an affirmative defense that must be pleaded and proved by defendant. While we have found no authority which squarely holds that guilt of the of-

fense charged must be affirmatively pleaded, there are several cases which hold it is not necessary to plead guilt, but it may be shown under a general denial. *Bruley v. Rose,* 57 Iowa 651, 11 NW 629, 631; *Illinois Cent. R. Co. v. Anderson,* 206 Ky 600, 268 SW 311; *Coleman v. Reed Bros. & Co.,* 18 Ohio App 316; 34 Am Jur 773, Malicious Prosecution § 118.

This is probably true because the issue of guilt is so closely allied to the issue of probable cause. Thus it is stated in 34 Am Jur 788, Malicious Prosecution § 147:

"It has frequently been held that the plaintiff in an action for malicious prosecution must, notwithstanding his acquittal in the original prosecution, always be regarded as tendering the issue of his innocence or freedom from liability, and must fail in his action if that innocence or nonliability can be disproved, whether the prosecutor acted from malicious motives or not, and whether or not he knew of the facts establishing the plaintiff's guilt or liability."

Moreover, in this case the matter of plaintiff's guilt appears as a matter of law from his own case. In such a posture the situation is similar to defendant's reliance on plaintiff's contributory negligence as a matter of law to defeat recovery when such negligence appears from plaintiff's own case. *Wallace v. Portland Ry., L. & P. Co.,* 103 Or 68, 204 P 147.

Plaintiff urges that whether probable cause existed is not dependent upon the actual state of the case, but upon the honest and reasonable belief of the party commencing the proceeding. *Watts v. Gerking et al.,* 111 Or 641, 222 P 318, 228 P 135. What is meant by this statement is explained in 34 Am Jur 789, Malicious Prosecution § 147, as follows:

"It is true that sometimes courts have said that

probable cause does not depend upon the guilt or innocence of the accused, but when they have so said, they referred to the fact that plaintiff had urged his innocence as conclusive in favor of his right to recover, and merely intended to affirm that notwithstanding such innocence, the action of the prosecutor may have been justified because of incriminatory circumstances known to him, and not that the guilt of the accused could coexist with a right on his part to recover for being prosecuted for a criminal act of which he is guilty."

In earlier paragraphs we have mentioned that plaintiff assigns as error the ruling of the court in refusing to admit certain offered testimony. Plaintiff claims the court erroneously refused to admit evidence relating to a claimed custom in the turkey industry. The offer of proof made with reference to the rejected testimony was made in two parts. As to the first part of the offer, there appears to be no proper question propounded to the witness relating to custom. The question asked by counsel for plaintiff is: "What is the marketing procedure after they are brought into the plant?" In the offer of proof plaintiff's counsel stated: "I believe that last evening I asked the witness, Mr. Shoemaker, questions with regard to the matter of custom and usage in the trade, particularly as it pertains to the transaction between Washington Creamery and Arnold Selnes and involving these 1468 turkeys." As indicated above, the record shows that such a question was not directed to the witness.

Counsel for plaintiff then made an offer of proof as follows:

"By this witness I propose to show that his testimony would be, if allowed to testify, that there are several manners of doing business that were customary in the trade in this vicinity, first

of which would be a cash purchase; the second of which would be custom killing process whereby the producer would have the turkeys killed and processed in the processing plant, in this case Washington Creamery Company. The turkeys would be stored in the Terminal Ice and Cold Storage plant here in Salem in the name of the producer, the producer paying the processor for his charges in the processing of those turkeys; thereafter, of course, the turkeys would remain the property of the producer and he could dispose of them as he may choose.

"The third manner in this vicinity in the turkey industry, which the witness would testify to, that the turkeys were brought to the processing plant, in this case Washington Creamery Company, and the turkeys were processed and stored in the name of the processor. The processing charges would be a charge against the turkeys and the processor storing the turkeys in his own name as security for the payment of the processing charges; there may be advances made by the processor to the producer, depending upon the agreement between the two as to the price to be paid by the processor to the producer. Then when the turkeys were disposed of the procedure would reverse the order of marketing and come back and the processor would pay the producer any balance due him.

"I believe that briefly outlines the procedure in this industry to which this witness would testify. He could further testify as to the procedure of advances on these turkeys from the broker or warehouse men to the ultimate market which—the center of which is New York City, and the custom of getting advances on the turkeys from the broker or from the finance houses after they have been stored in the warehouse by the processor in order to finance the processor for payment of taxes, insurance and storage charges, etc. I think that briefly outlines what testimony they would offer with regard to the custom and usage in the trade."

The offer relates to certain "manners" of doing business that were customary in the trade. The only one that could be applicable here at all is the "third manner." However, this offer relates to an agreement between the parties as to price. Thus this offer assumes a fact not supported by the record; i.e., an agreement between the parties as to price. Moreover, none of the methods involves a custom whereby the processor would be entitled to the beneficial ownership and use of the turkeys delivered, except by cash sale transaction, which is not claimed in this case. The first offer is otherwise so vague and uncertain that we are at a loss to comprehend its meaning. It relates to dealing in the east not covered in this case. The custom of getting advances from the broker to cover the processing charges for the turkeys would not aid the plaintiff in the instant case because the advance here was over twice the amount of the processing charges.

The second offer of proof was as follows:

"At this time I would like to make an offer or proof of the testimony to be elicited from the witness, Sam Speerstra, with regard to the customs and usages in the turkey industry, particularly with regard to the marketing of the turkeys. I believe Mr. Speerstra would testify, his testimony would show, if permitted to testify, that the market center is in the eastern part of the United States, primarily New York City and the immediate vicinity; the market trend is ordinarily slow during January and into February, but that the market trend begins to rise or go upward from March until July; that in both January and February the market is limited; that there is practically no market at that particular time. As I indicated, after the rise—the rise is from March

on and toward the holiday season in the fall of the year.

"Then as to matters pertaining to the custom and usage in the trade with regard to taking title in the processor's name, when the turkeys have been processed and placed in cold storage and the producer is unable to pay the charges when the turkeys are taken in, then title to the turkeys is taken in the processor's name, and it is customary to procure or accept a loan to pay the costs. The processor will have approximately $1.50 to $3.00 per turkey, eviscerated toms, and because of the huge sums involved in running through thousands of turkeys large amounts are necessary and the processor is then obligated to make such a loan or loans. Most processors assume when the growers bring in turkeys he has the implied authority to sell those turkeys."

In the first place the offer is insufficient because it merely states "I believe" the witness would testify. Such a statement is no assurance that the witness would so testify.

Moreover, the custom relates to a situation where the grower is unable to pay the processing charges when the turkeys are delivered. There is no evidence of such inability in this case. The last sentence of the offer relates to an assumption made by the processor, which, of course, would not relate to nor be proof of a custom. This offer does not relate to a custom which would authorize a processor to treat delivered turkeys as his own.

The foregoing offers of proof were properly rejected. We also again refer to our decision in Montgomery relating to the subject of custom and usage.

■ The court did not err in refusing to admit into evidence a report covering a cash sale of other turkeys which are not connected with this case.

We have examined plaintiff's other assignments of error and have found no ruling of the trial court which would be ground for a reversal in the instant appeal.

Under the record in this case the liability of the defendants Svinth, Meeks and the bank is dependent upon the liability, if any, of the defendant Arnold Selnes.

In view of the conclusions herein reached, the trial court did not commit error in granting the motions of defendants for nonsuit and directed verdict. The judgment appealed from is, therefore, affirmed.