Argued February 8, affirmed in part, reversed in part, October 23, 1963, rehearing March 4, opinion modified and former decision adhered to April 22, 1964

# GOWIN *v.* HEIDER ET AL

386 P. 2d 1
391 P. 2d 630

*Norman K. Winslow,* Salem, argued the cause and filed briefs for appellants.

*Ralph W. Bolliger* and *Carlton R. Reiter,* Portland, argued the cause for respondent. With them on the brief were Reiter, Day & Anderson and Lewis B. Hampton.

Before MCALLISTER, Chief Justice, and ROSSMAN, SLOAN, GOODWIN and LUSK, Justices.

LUSK, J.

This is an appeal by the defendants from an adverse judgment based on the verdict of a jury in a case involving three causes of action, one for malicious prosecution, the other two for conversion. The judgment was as follows: On the first cause of action, malicious prosecution, $36,000; on the second cause of action, conversion, $2,000; on the third cause of action, conversion, $7,000. Besides these sums, the jury in-

cluded in their verdict punitive damages on the first and third causes of action, but these items were removed by the court on defendants' motion for judgment n.o.v. Trial of the case commenced March 14, 1961, and was concluded on March 25, 1961. The transcript of testimony comprises 1,366 pages and there are nearly 100 exhibits. In appellants' opening brief, which is 262 pages in length, there are 30 assignments of error. A statement of the case may, nevertheless, we believe, be brought within reasonable compass.

The grievances of which the plaintiff complains all stem from the purchase by him from the defendant Baird, who operated the River Bend Garage at Sheridan, Oregon, of three log trucks and trailers on the twenty-eighth day of March, 1959. Gowin turned in a Ford pickup truck and other vehicles as a down payment, figured at $2,650, and executed a chattel mortgage on the vehicles purchased by him as security for the balance of the purchase price, stated in the mortgage to be $16,500. The balance was to be paid at the rate of $660 per month on the tenth day of each month thereafter, commencing May 10, 1959. As further security for the indebtedness Gowin and his wife assigned to Baird their interest in a contract of sale of farm property near Gaston, Yamhill County, Oregon, which the Gowins were purchasing, and where they were living at the time.

Baird and his wife executed an assignment and guaranty of payment of the chattel mortgage to the defendant Heider for a consideration of $14,000, evidenced by Heider's check to Baird in that amount dated June 25, 1959.

Gowin made timely payments of the installments on the mortgage due in May and June, but made none

thereafter. He claimed in his testimony that the time of the July payment was, at his request, extended on July 25 to August 28 by both Baird and Heider. The basis for the request was that his trucks were "not working steady" during the fire season.

At the same time, Gowin, according to his testimony, made another request, which likewise was acceded to by both defendants. On June twenty-eighth Gowin had bought a freight truck and trailer which he leased on July sixteenth to a man named Rouse. This was not a log truck and was not purchased from Baird and was not included in the mortgage. It is referred to by the parties as the Hesketh truck. This truck broke down at La Grande, Oregon, while hauling a load of grain and the motor had to be completely overhauled. Gowin testified that on July twenty-fifth, at his request, Baird and Heider agreed that Gowin might transfer the motor—# 78488—from a truck covered by the mortgage and known as the "West Coaster," described in the mortgage as a 1947 International log bunk truck—into the Hesketh truck. Accordingly, Gowin had the motor taken out of the West Coaster and installed in the Hesketh truck. He delivered the motor from the Hesketh truck to Cummins Motors in Portland to be repaired.

Early in August Gowin had decided to move to Idaho. He had repurchased from Baird the Ford pickup truck which he turned in on the purchase price of the mortgaged vehicles. Acting on his instructions, Mrs. Gowin, on August eighth, went to Sheridan and paid Baird the amount owing on the pickup. She told Baird that they had transferred the motor from the West Coaster into the Hesketh truck and that Gowin would replace it with another good motor. Baird said

"o.k." She also told him that they were thinking of moving to Idaho where it would be easier to obtain a number one P.U.C. permit for the freight truck (such a permit would enable the permittee to operate in all but two of the states). During this colloquy Baird telephoned Heider and told him that Mrs. Gowin was there paying off the pickup.

About August tenth Gowin drove the Hesketh truck, which was now equipped with the motor from the West Coaster, to Coeur d'Alene, Idaho. The mortgaged vehicles were left behind at the farm. His wife and children joined him a few days later and they were living in an apartment in Coeur d'Alene at the time of his arrest on the complaint of Baird out of which the action for malicious prosecution grows.

Early in August Baird received a telephone call from Paul M. Cody, who had been employed by Gowin as a truck driver and mechanic. Cody told Baird that Gowin had left for parts unknown and had abandoned the mortgaged vehicles which were at the farm. Baird went to the farm, and, according to his and other testimony on behalf of the defendants, discovered that, in addition to the motor having been removed from the West Coaster, a differential head was missing from another truck described as a '47 Diamond T, and the trucks and trailers had been stripped of their good tires, numerous wheels, stakes, chains and binders and accessories of various sorts and descriptions. In removing the motor the wires had been cut and the pipe lines sawed off.

Gowin had departed without leaving a forwarding address. Letters addressed to him were returned to the writers. Baird inquired among the neighbors as to Gowin's whereabouts but could learn nothing. He

then consulted the sheriff of Yamhill County, who told him to use his own judgment, but to protect his property and go and get it. On August 17 and 18, Baird caused the mortgaged vehicles to be repossessed and brought back to the River Bend Garage. Two of the trucks could not be driven and had to be towed and it was necessary to supply seven or eight tires mounted on wheels before some of the vehicles could be moved.

Baird continued his efforts to locate Gowin, but was unsuccessful. The State Police were also looking for him. Gowin's P.U.C. permit had been suspended for failure to have on file proper insurance and the police, who wanted to pick up his license plates, inquired of Baird at the River Bend Garage as to Gowin's whereabouts. Finally, Baird, at the suggestion of the sheriff, saw the district attorney and on August 20 signed a complaint charging Gowin with larceny by bailee of the following described property:

1   275 Cummins diesel motor # 78488
1   150 gallon Pearce water tank
8   Kelly traction-rib tires
2   Kelly CHC tires
1   3012 differential head.

The complaint was filed in the District Court for Yamhill County.

About a week later Baird learned that Gowin was in Coeur d'Alene and the sheriff proceeded there with a warrant, apprehended Gowin on August 27 and returned him to McMinnville where he was confined in jail for a period of 19 days. On September 18, on motion of the district attorney, the criminal complaint was dismissed. Before Gowin was released from jail,

apparently about September sixteenth, Orville Aebi, acting for Baird, armed with a letter from Gowin to Mrs. Gowin, who was still in Coeur d'Alene, went to that city, delivered the letter to her, and received possession from her of the Hesketh truck and various accessories and articles of equipment, including those described in the criminal complaint, and brought them back to Oregon.

As previously stated, the first cause of action is for malicious prosecution. The second cause of action, for conversion, is based upon the repossession by the defendants of the mortgaged vehicles and the third cause of action, also in conversion, is based upon the defendants' taking possession of the Hesketh truck and trailer. The action was commenced on May 19, 1960. Among other allegations in the answer of the defendant Baird it was alleged that on June 9, 1960, the grand jury of Yamhill County, upon a full and complete disclosure of the facts and circumstances with reference to the taking of the property by the plaintiff, indicted the plaintiff for the crime of larceny by bailee, the property involved being the same property as that described in the criminal information which had been previously dismissed. Thereafter, on January 16, 1961, the plaintiff filed his "amended supplemental complaint" in which he alleged, in substance, that the indictment had been procured by the defendants, who had intentionally failed to disclose all the facts concerning the transaction and related falsehoods to the district attorney and grand jury; and that the sole purpose of the defendants in procuring such indictment was to aid them in defending against the pending action for malicious prosecution. The amended supplemental complaint further alleged that on September 29, 1960, the plaintiff was acquitted of the charge in a jury trial.

It is plaintiff's theory that Baird in all his alleged tortious activities was the agent of Heider.

We will consider the three causes of action in the order in which they appear in the complaint. The question of Baird's agency for Heider will be separately treated.

## MALICIOUS PROSECUTION

*Favorable Termination.*

■ The defendants raised by demurrer and motions for nonsuit and directed verdict the question whether a favorable termination of the criminal prosecution was alleged and proved.

The argument in support of the demurrer is based upon the following allegation of the complaint: "That thereafter and on or about the 18th day of September, 1959, the aforesaid criminal complaint and charge against plaintiff were dismissed upon motion of the district attorney of Yamhill county;".

It is said, first, that a district attorney cannot dismiss a criminal complaint. We agree, but the allegation is not that the district attorney dismissed the complaint, but that it was dismissed upon his motion and we read this to mean that it was dismissed by the court, since only the court could have taken such action. Next, it is suggested that the complaint fails to allege a favorable termination of the prosecution, that is, a termination which established or fairly implied lack of a reasonable ground for prosecution of the plaintiff. *Gumm v. Heider,* 220 Or 5, 23–24, 348 P2d 455. But the fact of dismissal by the court, without more, carries with it such a conclusion and the bare allegation that the complaint was dismissed is sufficient. *Kuhnhausen*

*v. Stadelman,* 174 Or 290, 304, 148 P2d 239, 149 P2d 168. See, also, 34 Am Jur 771, Malicious Prosecution § 114, 1963 Cum Supp 124.

The demurrer was properly overruled.

It is contended that the evidence is insufficient to show a favorable termination of the prosecution, because the dismissal was "a compromise procured, sought and consented to by the plaintiff."

The record shows that while Gowin was in jail, in addition to the charge of larceny by bailee, two other criminal charges were pending against him, one initiated in Yamhill county and the other in Union county, for obtaining money by false pretenses by the issuance of checks on banks in which the accused had unsufficient funds. The district attorney of Yamhill county had been informed of the Union county charge. An attorney representing Gowin entered into an agreement or understanding with the district attorney that the bad check charge initiated in Yamhill county would be reduced from a felony to a misdemeanor and Gowin permitted to enter a plea of guilty to such charge and that the charge of larceny by bailee would be dismissed. As part of this arrangement, Gowin would make restitution of the amounts for which the checks were issued and this was done. Gowin protested that he was innocent of the bad check charge, but nevertheless agreed to the "deal" and entered a plea of guilty to that charge on September 18, 1959, and was put on probation for a period of three years. On the same day the district court entered the following order of dismissal of the charge of larceny by bailee:

> "Upon motion of the District Attorney on the grounds of insufficient evidence, and it appearing

to the Court that restitution has been made, I ORDER the complaint herein dismissed."

Baird testified that he pressed the criminal prosecution in order to get his equipment back and that he kept Gowin in jail until he got it back. To that end Baird visited Gowin two or three times at the jail and there is evidence that both he and the sheriff indicated to Gowin that the duration of his confinement would depend on his cooperation with Baird's wishes.

On September 18, the day that Gowin was discharged and while he was still in jail, Baird, according to the latter's testimony, obtained Gowin's signature to powers of attorney for Baird's use in securing the transfer of the titles to the three trucks and three trailers covered by the mortgage. Baird testified that he agreed with Gowin, "to let him get out of jail," that Gowin would transfer his equity in the Hesketh truck and trailer if Baird "wouldn't push Burns Brothers" for buying the tires which Gowin removed from the mortgaged trucks and that this agreement "helped him get out of jail on the other charges."

Gowin testified that on September 18 he signed eight powers of attorney, one of them on the Hesketh truck; that Baird represented to him that a concern referred to as Peerless (which held the conditional sales contract on the Hesketh truck) had repossessed it. Gowin further testified that Baird promised to reassign to him the contract of purchase of the farm if Gowin would sign the powers of attorney and that after he signed them Baird refused to give him the assignment, saying that he never intended to do so. Then, according to Gowin, "I blowed my top * * * and the Sheriff told me I'd better cooperate in this deal or I would be in here a long time."

█ One of the essential elements of a cause of action for malicious prosecution is that the criminal proceeding shall have terminated in favor of the accused. *Gumm v. Heider,* supra, 220 Or at 21; Restatement, 3 Torts, § 658. But where the proceeding is terminated as the result of a compromise or settlement of the parties "there is no such termination as may be availed of for the purpose of such an action." *Halberstadt v. New York Life Ins. Co.,* 194 NY 1, 86 NE 801, 21 LRA NS 293 (quoted in *Gumm v. Heider,* supra, at 23). See, also, *Forster v. Orr,* 17 Or 447, 21 P 440; Restatement, ibid, § 660 (a) (i); Annotation, 67 ALR 513. If, however, a settlement is not the free and voluntary act of the plaintiff in malicious prosecution, but is brought about by duress practiced upon him by the defendant, the rule just stated is without application. *White v. International Text Book Co.,* 156 Iowa 210, 136 NW 121, 42 LRA NS 346; *Robertson v. Bell,* 57 Wash 2d 505, 511, 358 P2d 149; 34 Am Jur 726, Malicious Prosecution § 42; Annotation, 67 ALR 519.

█ The evidence above recited (and there is more to the same effect) is clearly sufficient to warrant the submission of the question of duress to the jury.

Gowin was in jail. His wife and family were in Idaho without funds. Although he had an attorney, the negotiations between him and Baird in which, if Gowin is to be believed, the sheriff was aiding and abetting Baird, went on when the attorney was not present. The attorney did not testify. The jury could have found that Baird took advantage of Gowin's necessitous position to compel restitution of the property allegedly stolen, that the settlement was not Gowin's free and voluntary act, and that the agreement of the district attorney to move to dismiss the criminal

information was conditioned upon securing Baird's consent.

Other grounds of the motions for nonsuit and directed verdict will now be considered.

*Probable Cause.*

■ Want of probable cause is the gist of the action for malicious prosecution. *Shoemaker v. Selnes et al,* 220 Or 573, 578, 349 P2d 473, 87 ALR2d 170. It has been said that termination of the prosecution by reason of a compromise which the accused has voluntarily entered into is an admission of probable cause, *Forster v. Orr,* supra, though, as Dean Prosser points out: "* * * the better reason seems to be that the accused has consented to a termination which leaves open the question of his guilt and possible conviction, and so cannot take advantage of it." (Prosser on Torts (2d ed) 651.) The latter theory has the approval of the Restatement, ibid, 400. In this opinion, therefore, we treat the question of want of probable cause under a separate heading from that of favorable termination, as have the parties in their briefs, and as is generally done by the text writers.

It is urged in support of the motions that the evidence establishes as a matter of law that the plaintiff was guilty of the crime of larceny by bailee. If this be so, it is conclusive evidence of probable cause for initiating the criminal proceeding and a complete defense to the charge of malicious prosecution, notwithstanding the plaintiff's acquittal by the jury. *Shoemaker v. Selnes et al,* supra, 220 Or at 578, 584.

While the defendants in the brief present a persuasive argument upon the weight and effect of the evidence, it can scarcely be said that it is all one way.

As to each of the items of property mentioned in the criminal complaint, there is a conflict which could be resolved only by the jury.

We need only refer to the evidence as to the motor, for, as stated by Lord Mansfield in *Reed v. Taylor,* 128 Eng. Rep. 472, 4 Taunt. 516 (CP 1812): "* * * if a man prefers an indictment containing several charges, whereof for some there is, and for others there is not probable cause," this will "support a count for preferring that indictment without probable cause." See, also, *Singleton v. Perry,* 45 Cal 2d 489, 289 P2d 794; *Boogher v. Bryant,* 86 Mo 42, 49–50, 9 Mo App 592; *Chandler v. Petit,* 2 Hall (2 NY Super) 315, 344; *Palmer v. The Birmingham Manuf. Co.,* 18 Times Law Rep. 552 (KB 1902); 38 CJ 400, Malicious Prosecution § 26; 2 Greenleaf on Evidence (14th ed) 450, § 449.

The criminal information charged the plaintiff with the crime known as larceny by bailee, which is denounced by ORS 165.010.⊙ Specifically, the defendant was accused of removing the property described from the county of Yamhill where the property was obtained without the written consent of Baird, the owner thereof, and that he did fail, neglect and refuse to deliver, keep and account for the same according to the nature of his trust. It was conceded that at the time of the execution of the mortgage Baird agreed that Gowin could use the equipment on log hauls in several counties of western Oregon. In making the motions for nonsuit and directed

---

⊙ ORS 165.010 "(1) Any bailee, * * * including every mortgagor of personal property having possession of property mortgaged, * * * who * * * removes from the county where situated when obtained, without the written consent of the bailor * * * or fails, neglects or refuses to deliver, keep or account for, according to the nature of his trust, any * * * property of another delivered or intrusted to his care, control or use * * * shall be deemed guilty of larceny * * *."

verdict, counsel for the defendants stated that they made no claim that "the failure of written consent would make the person taking the property outside the State of Oregon guilty of the offense as a matter of law, if there were some other form of consent," but added that this was a circumstance to be considered on the question whether the accused had failed to account for the property according to the nature of his trust.

We agree that this is a pertinent fact and one that might be considered by the jury on the question of whether Gowin was guilty of the crime charged, but it is clear to us that such guilt does not appear as a matter of law so far, at least, as the motor is concerned, because the evidence for the plaintiff is that Baird orally authorized Gowin to transfer the motor into the Hesketh truck and remove it to Idaho. If this evidence is to be believed it would be sufficient to establish want of probable cause, for it shows that Baird knew that Gowin was not guilty of larceny by bailee of the motor. *Hryciuk v. Robinson,* 213 Or 542, 561, 326 P2d 424.

### Probable Cause—Effect of Indictment.

It is further insisted that the indictment returned against the plaintiff is evidence of probable cause which was not overcome by the plaintiff. This action was commenced on May 19, 1960. It will be recalled that the defendant Baird in his answer alleged that on June 9, 1960, the plaintiff was indicted for the same crime stated in the criminal information which had previously been dismissed, and that in an amended supplemental complaint the plaintiff alleged that he was acquitted of the charge in a jury trial and that the indictment had been procured by false testimony of the defendants and their failure to make a full disclosure before the grand jury. The defendant Baird testified

before the grand jury which found the indictment, though Heider did not. On the trial of this case the court charged the jury, in substance, that if the defendants made a full and fair disclosure to the grand jury of the facts then known to them and the grand jury indicted Gowin on the basis of that disclosure the indictment would be conclusive evidence of probable cause, but that if a full and complete disclosure was not thus made "probable cause is not conclusively proved."

As the authorities cited and the views expressed in *Hryciuk v. Robinson,* supra, indicate, this instruction was more favorable to the defendants than was their due. The indictment is merely some evidence of probable cause, *Shoemaker v. Selnes,* supra, 220 Or at 581; Prosser on Torts (2d ed) 657; Restatement, ibid, § 664 (2); and if it was procured by false testimony of the defendant in an action for malicious prosecution it has no tendency whatever to establish probable cause. According to the well-considered opinion in *Lindsey v. Couch,* 22 Okla 4, 98 P 973, the presumption of want of probable cause arising from a dismissal of the prosecution is counterbalanced by the presumption of probable cause arising from a subsequent indictment of the party for the same offense, thus leaving the question of probable cause to be determined by other evidence. Under this view of the law, which we think is correct, the instruction as given was error if it be assumed, as the jury could have found, that the dismissal of the criminal charge was on the merits and not brought about by a compromise voluntarily entered into by the plaintiff. But the error was against the plaintiff.

We think that there was evidence sufficient to go

to the jury on the issue of full disclosure. For example, Baird did not testify before the grand jury that he had given Gowin permission to remove the motor from the West Coaster and take it to Idaho. Of course, that fact was in dispute, but the jury could have found that such permission had been given and that Baird willfully withheld the information from the grand jury.

■ We conclude on this branch of the case that the evidence of favorable termination, want of probable cause, and malice, was sufficient to warrant submission of this cause of action to the jury and that the motions for nonsuit and directed verdict were properly denied as to the defendant Baird.

*Rulings on Evidence.*

(1) Baird, as an adverse witness, and Donald Mills, a member of the grand jury which indicted Gowin, were examined about Baird's testimony before that body. Numerous objections were made to the questions asked them. The objections for the most part were overruled and the rulings are assigned as error. We think that many of the questions were incompetent and the evidence elicited prejudicial.

In examining these witnesses upon this subject counsel for the plaintiff seem to have proceeded upon the theory that any facts admissible in evidence in an action for malicious prosecution should have been disclosed to the grand jury by Baird in order to fulfill the obligation of full and fair disclosure. We cannot assent to this idea. In *Gumm v. Heider,* supra, an action for malicious prosecution based on the instigation of a criminal action growing out of the giving of a postdated check which was not paid on presentation, we held that failure of the defendant (the private prosecutor) to inform the district attorney that the

check was postdated authorized the jury to find deliberate misrepresentation of the fact in that regard. But we pointed out that the defendant was a lawyer "conscious of the materiality of the fact that the check was postdated." On the other hand, in *Humbert v. Knutson et al,* 224 Or 133, 142–143, 354 P2d 826, we said that there was no nondisclosure in failing to tell police officers of "the animosity, bad feeling and prior difficulty between plaintiff and defendants." A similar decision is *Christy v. Rice,* 152 Mich 563, 567, 116 NW 200, cited by the court in *Humbert v. Knutson.* The reason for these rulings is that such testimony is not relevant to the question of the guilt or innocence of the person charged, although it would be relevant on the question of malice in an action for malicious prosecution.

The record shows that Baird was instructed by the district attorney when he commenced his testimony before the grand jury to tell his story in his own words and that he did so, though a few questions were asked him. He could not be expected to state every fact that might occur to an astute lawyer as having some bearing on Gowin's guilt or innocence of the offense charged, and his failure to do so could not reasonably afford the basis of a finding that he had not made a fair and full disclosure to the grand jury. See Restatement, ibid, § 666 (1) (b), comment f at page 420. Since there must be a new trial, we point out the following matters inquired into by counsel for the plaintiff which should have been excluded: Whether Baird and Heider had talked about presenting the matter to the grand jury to help them in the pending civil action; whether Heider owned the mortgage when the motors were switched; whether Baird was Heider's agent to repossess the trucks; whether Heider had requested the dis-

trict attorney to present the case to the grand jury; whether any grand juror asked Baird whether he was connected in the transaction with Heider; whether the criminal information was dismissed for lack of evidence; whether Baird instituted the prior criminal action to get back his property; all questions that were asked relative to Gowin's farm; all questions relative to evidence in the malicious prosecution action that Gowin applied to the Oregon State Department of Motor Vehicles for correction of registration of the trucks involved in the motor switch.

■ An additional ground of objection to the testimony of the witness Mills is that he was permitted to testify to matter outside the scope of ORS 132.220 (1) which reads:

> "A member of a grand jury may be required by any court to disclose:
> "(1) The testimony of a witness examined before the grand jury, for the purpose of ascertaining whether it is consistent with that given by the witness before the court."

The judge ruled at first that Mills' testimony would be limited in the manner stated in the statute, but later permitted evidence that was not intended to impeach Baird's testimony before the grand jury by showing inconsistent statements, but rather to support the claim of Baird's failure to make a fair and full disclosure of the facts. Counsel for defendants says that this is prohibited by the statute. But the statute has never been so construed. *State of Oregon v. Moran*, 15 Or 262, 274, 14 P 419. In *State v. Mageske et al.*, 119 Or 312, 317, 227 P 1065, 249 P 364, where the earlier cases are cited, the court said:

> "The principle gleaned from the books, that when the demand for promoting justice either in a

civil or criminal case, outweighs the necessities for keeping the testimony before a grand jury secret, or when the reasons for keeping the testimony private have passed away, the court in its discretion should release the chain of secrecy and admit such evidence in order to prevent the claims of public justice from being unsatisfied: 1 Bishop on Crim. Proced., § 859; Wharton, Crim. Ev., § 510, and note 5 collating the authorities."

It was within the discretion of the court to permit the grand juror to testify, though only within the limits of relevancy heretofore outlined.

■ (2) Error is assigned to the court's overruling the defendants' objections to the plaintiff's offer in evidence of five exhibits. Two of these, plaintiff's exhibits 20 and 21, are photostatic copies of applications by Gowin dated August 3, 1959, to the State Department of Motor Vehicles for correction of registration records so as to show the "switch" of motors between the Hesketh truck and the West Coaster. Plaintiff's exhibit 15 is a letter dated August 20, 1959, from the Department of Motor Vehicles to Heider (with notation that a copy had been sent to Gowin at his Gaston address) advising Heider that an application had been received for correction of registration records covering a 1947 International log bunk truck showing that motor number HB 44699 had been installed in this vehicle (the truck referred to is the West Coaster and the motor was evidently the one removed by Gowin from the Hesketh truck, although, in fact, it was never installed in the West Coaster). The letter continued that title to the vehicle described was issued on March 31, 1959, showing Gowin as registered owner and Heider as legal owner and requested Heider to forward the certificate of title to the department so that the correction could

be made. There is evidence that Baird was informed by Heider of the contents of this letter. Plaintiff's exhibit number 16 is a letter from the Department of Motor Vehicles to Heider dated September 25, 1959 (after Gowin's release from jail), calling attention to the previous letter stating that no reply had been received and requesting Heider's immediate attention. The letter bears a similar notation that a copy had been sent to Gowin. Plaintiff's exhibit number 17 is a postcard reply to the department by Heider dated September 28, 1959, and reading:

"Dept. of Motor Vehicles;

"On the re-suspense Number C-9698, nothing can be done on this matter until we get it straightened out with Govin [sic]. The truck is in storage and is going to involve some litigation. Govin [sic] is gone. Just hold the matter in abeyance.

"Respectfully yours,
"Otto W. Heider,".

In offering these exhibits counsel for the plaintiff stated to the court that they were introduced solely to support the cause of action for malicious prosecution.

Counsel for the defendants objected to each of the offers on various grounds, including the grounds that the evidence was irrelevant and immaterial.

Plaintiff gives the following reasons why the evidence should be considered relevant. First, Exhibit 15, which refers to the West Coaster, shows "the true nature of the transaction between Baird and Heider because it indicated that a title was issued in the name of Otto Heider on March 31, 1959, which contradicts plaintiff's Ex. 14 [the chattel mortgage] and Heider's testimony that the mortgage was not assigned to him until May 10, 1960." It also shows, it is said, that "after

defendants approved of the motor switch" plaintiff "followed through" by complying with the statutory requirements relating to vehicles and motors, citing ORS 481.430 (2).

Exhibit 15, it is said, also shows the information the defendants had available when they continued the prosecution against the plaintiff after its receipt, and when Heider requested the district attorney to present the case to the grand jury and when Baird testified before the grand jury. These same claims are made for Exhibit 16 as to the period after Gowin was discharged from custody.

Exhibits 20 and 21, the applications for correction of registration records, it is again said, show that the plaintiff "followed through on his stated intention and applied to the State of Oregon to have the motor vehicle registration certificates corrected." It is further argued that the fact that the defendants did not make use of the information thus made available to them shows that they did not make a reasonable investigation of all the facts before filing the criminal information.

The veiled suggestion that exhibits 15 and 16 show the "true nature" of the transaction between Baird and Heider leaves us in the dark as to what counsel for the plaintiff contend its true nature was. We understand that it is the plaintiff's theory that in repossessing the mortgaged vehicles and taking possession of the Hesketh truck and initiating the criminal prosecution against Gowin, Baird was acting as the agent of Heider, but it does not appear that there is any contention that there was not a bona fide sale of log trucks and trailers by Baird to Gowin and a bona fide mortgage back from Gowin to Baird, or that Baird did not make a bona fide assignment of the mortgage to Heider

and a bona fide guarantee of payment of the debt secured by the mortgage in the event that Gowin should default. All these things are stated in substance in the statement of the case in the defendants' brief and the plaintiff has nowhere in his brief availed himself of the privilege or performed the duty set forth in Rule 25 of the rules of this court either to state that he "accepts the statement of the case in the appellant's brief" or to "point out with particularity any alleged omissions or inaccuracies therein."

While there is confusion in the evidence as to the date on which the mortgage was assigned to Heider, we think that the record does not leave in doubt the fact that it was assigned, that Heider paid Baird $14,000 for the assignment and that after the mortgaged equipment was repossessed Baird made good on his guarantee to Heider.

In fact much of this is not only conceded, but asserted by the plaintiff, who, in arguing the question of Baird's agency, says in his brief:

"Baird admitted that he was pressing criminal charges to get 'our' equipment back (Tr. 946). However, Baird had no claim whatsoever against the plaintiff because he had assigned all of his interest in the mortgage to Heider (Ex. 14), and had been paid by Heider for the assignment (Ex. C)."

Moreover, while it is true that the date, May 10, 1960, which appears on the assignment of the mortgage, is inconsistent with the title record referred to in the letter from the Department of Motor Vehicles, yet that record is entirely consistent with the fact that on March 31, 1959, the day after the execution of the mortgage, Gowin was the mortgagor with the right to possession and Heider the mortgagee of the property

in question. See ORS 481.040 (4), 481.105 (3), and 481.110. It may be added that these letters were in fact only hearsay as to the state of the title to the West Coaster. The statute provides a method of proving that fact (ORS 481.117), but it does not make a letter from the Director of the Department of Motor Vehicles evidence as to the ownership of a motor vehicle or of any interest in one.

Nor do we think that the evidence under consideration throws any light on the question whether Gowin had the permission of the defendants to remove the motor from the mortgaged vehicle. Gowin and his wife testified that he had; both defendants and Mrs. Baird stoutly denied it. To hold the evidence relevant on this question would be like saying that, if the issue were whether a man had stolen a revolver and he claimed that the owner had given it to him, he could prove the gift by showing that he had applied to the chief of police for permission to carry a concealed weapon.

At the time that Heider received exhibit 15, the mortgaged equipment had been repossessed and the criminal complaint filed and the defendants knew that the West Coaster was minus a motor. Exhibit 15 was no news to them on that subject. If they had given Gowin permission to remove the motor from the West Coaster and take it to Idaho this would be an end of the matter as far as any question of probable cause to prosecute Gowin for larceny of the motor is concerned. If they had not given Gowin such permission then they had probable cause under the circumstances to prosecute him on that charge. We have not been told by counsel, nor are we able to conjecture, what sort of investigation the receipt of the letter would suggest to the defendants, nor what additional facts an investigation

would uncover which might be reasonably expected to stay the hand of the prosecutor.

The issue whether Gowin had permission to remove the motor was a crucial one in the case and it cannot be said that the admission of this incompetent evidence was not prejudicial to the defendants. It was not only irrelevant, but its natural tendency was to lead the jury to think that somehow an agency of the state had affirmed the rectitude of Gowin's conduct.

■ (3) Over objection of the defendants, the plaintiff was permitted to introduce evidence that the plaintiff was not guilty of the bad check charges. The court permitted this evidence to come in on the theory that the defendants themselves had first opened up the subject and there may be some justification in the record for that view. However, on another trial such evidence should not be admitted. The defendants had nothing to do with these charges and the question whether the plaintiff was guilty or innocent of them was entirely foreign to the issues in the action for malicious prosecution. This is not to say, however, the Gowin's testimony that he protested his innocence of the check charges when the settlement was being negotiated was not admissible.

*Agency of Baird.*

The plaintiff contends that in filing the criminal information Baird was acting for Heider. The evidence relating to this issue is as follows:

Heider owned the River Bend Garage and Baird operated it for him. The principal business of the garage was the repair of heavy equipment. Heider paid Baird a salary of $400 a month in return for which Baird took care of the repairs, sold parts, and occasionally brought in equipment which Heider repos-

sessed for default in payment on mortgages or conditional sales contracts. Heider stopped at the garage every day to pick up the receipts from the business which he deposited in his own bank account. Twice a month he turned over to Mrs. Baird, who kept the books for the garage, sufficient money to pay expenses. She deposited the money in a separate bank account (in which Heider had no interest) under the name of River Bend Garage. Mrs. Baird paid the bills with checks drawn on this account. Baird had the right to repair his own equipment in the garage, but was required to pay for the work as would any other customer.

For a number of years Baird had engaged in the trucking business under a Public Utilities Commissioner permit in the name of Sheridan Truck Service. Heider had no interest in this business or the vehicles used in it. The trucks and trailers involved in this case were owned by Baird and his wife and had been used by Baird in his trucking operation before their sale to Gowin.

Heider was then a practicing attorney and was also engaged in financing the purchase of automotive equipment. Before the sale here involved was consummated Baird took Gowin to Heider's office to discuss financing. Baird said to Gowin: "I'll have to see Mr. Heider. He is calling the shots." The mortgage was prepared by Heider and the transaction closed in Heider's office. The record is confused and confusing as to just when the assignment of the mortgage was executed. A signed copy in evidence indicates the date as May 10, 1960. Heider testified to this date, but immediately corrected it to 1959. A ledger sheet from his books shows that he opened an account with Gowin based on this trans-

action on March 28, 1959, the date of execution of the mortgage, and, as previously stated, he paid Baird $14,000 for the assignment on June 25, 1959. By June, 1960, Baird had paid Heider the major part of the mortgage debt.

On August 13, 1959, Heider told Baird that Gowin had left the country and on August 16, 1959, Heider and Baird went together to plaintiff's farm, a 30 mile drive, to inspect the mortgaged property.

When Baird repossessed the mortgaged vehicles he brought them back to a lot owned by Heider adjacent to the garage.

Before Baird went to the district attorney to file criminal charges against Gowin he told Heider that he was going to do so. Heider testified in a pretrial deposition:

"Q: Anyway, to boil it down, the signing of the criminal complaint was without your knowledge?

"A: That's right. It was strictly Mr. Baird's— I can answer one question on that if you want me to. Mr. Baird asked me what he could do to stop Gowin from stealing and robbing from him, and I said, 'Do whatever you like about it,' and he said, 'I'm going to see the Sheriff and the District Attorney.' I didn't stop him.

"Q: You knew he was going?

"A: I didn't know that he went. I knew that he intended to. You asked the date he went. I knew he did go down eventually."

Baird saw Deputy District Attorney Frum in the district attorney's office. He was unable to tell Mr. Frum about the legal nature of the security instrument held by Heider. Frum called Heider on the phone and Heider gave him the information. He made it clear

to Heider that Baird was in his office and that his purpose was to file a criminal complaint against Gowin. A day or two after filing the complaint Baird told Heider that he had done so.

It is conceded that Heider was active in procuring the indictment of Gowin, but this may be put to one side.

The indictment was a new proceeding, necessarily so since the plaintiff could not maintain the present action without showing that the first prosecution had terminated. *White v. International Text Book Co.,* supra, 156 Iowa at 220; *Reell v. Petritz,* 224 Ill App 65. This was the view rightly taken by counsel for the plaintiff on the trial, and, though the rule governing the effect of the indictment on probable cause is not for this reason inapplicable, since both prosecutions were for the same offense, it is not logical to infer that Heider had a hand in the earlier proceeding because he asked the district attorney to commence the later one, which, it may reasonably be assumed, would never had been instituted but for the fact that some five months after the criminal information was dismissed the plaintiff filed the complaint in the present action for malicious prosecution.

The burden of proving that Heider participated in the institution of criminal proceedings against Gowin was upon the plaintiff. The character of evidence required was stated in *Meyer v. Nedry,* 159 Or 62, 68, 78 P2d 339, and reiterated in *Hryciuk v. Robinson,* supra, 213 Or at 562, as follows:

"The test of liability in an action for malicious prosecution is: was defendant actively instrumental in putting the law in force? To sustain the action, it must affirmatively appear as part of the case of

the party demanding damages that the party sought to be charged was the proximate and efficient cause of maliciously putting the law in motion. Mere passive knowledge or acquiescence or consent in the acts of another is not sufficient to make one liable. To impose liability there must be some affirmative action by way of advice, encouragement, etc."

The evidence discloses that Baird was Heider's agent in the operation of the garage and it could reasonably be found that he acted for Heider in repossessing the mortgaged vehicles, for this was a service included in those for which Heider paid Baird $400 a month.

Heider testified, in substance, that he was not interested in the property because he had the guarantee of Mr. and Mrs. Baird, but the jury could have rejected this testimony as contrary to normal human conduct. Ordinarily, a creditor does not willingly forego his security. Moreover, while Baird, owing to his contingent liability, had a strong interest in the recovery of the property, he had no legal right or title to it and no right to repossess it on his own behalf.

In a number of cases collected in the Annotation, 120 ALR 1322, 1325–1331, it is held that ordinarily commencement of a criminal prosecution is not within the scope of the authority of an agent, whether he be a partner or a servant, and that mere knowledge of or acquiescence in the proceeding is not sufficient to bind the other partner or the master. This would seem to be the correct rule where, as stated in the Annotation in 18 ALR2d 402, 406, "the duties of the particular servant or agent involved are of a restricted and specific nature." If, however, the prosecution was instituted by the servant for the purpose of protecting the master's property or to recover back property which

had been stolen the authority may be implied, 18 ALR2d 407. See the cases cited in the margin.[9] The theory of this distinction is thus stated in *Nesben v. Koos,* 59 ND 269, 271–272, 229 NW 368, quoting from 18 RCL 65:

> "The question whether or not the person causing the wrongful arrest was an agent, and acting within the general scope of his authority, is for the jury under proper instructions. Ordinarily the arrest or criminal prosecution of an offender, even where the offense was against the property of the principal, is not within the scope of an agent's employment. In doing such act the agent acts in response to his duty as a citizen to see that public justice is done by punishing the offender. He by such an act does not, in theory of law, seek to punish the supposed theft because he has wronged the principal, but because he has wronged the state."

See, also, 34 Am Jur 758, Malicious Prosecution § 89.

■ It is not suggested that any of the cases cited in footnote 2, supra, are precisely in point. For the most part they are like *Hornin v. Montgomery Ward & Co.,* 120 F2d 500 (3d Cir. 1941), where a store employee, in this instance the manager, to whom has been entrusted the duty of protecting his employer's property, commenced the criminal prosecution. Here, Baird had no general authority of this nature with respect to Heider's property except, perhaps, the property used

---

[9] Pierre v. Great Atlantic & Pacific Tea Co. (1935) 4 Cal App2d 468, 40 P2d 909; Jorgenson v. Bartlett Lumber Co. (1925) 232 Mich 169, 205 NW 138; Cameron v. Pacific Express Co. (1892) 48 Mo App 99; Coffman v. Shell Petroleum Corp. (1934) 228 Mo App 727, 71 SW2d 97; Nesben v. Koos (1930) 59 ND 269, 229 NW 368; Chicago, R. I. & P. R. Co. v. Holliday (1911) 30 Okla 680, 120 P 927, 39 LRA NS 205; Hornin v. Montgomery Ward & Co. (1941, CA3d Pa) 120 F2d 500; Staples v. Schmid (1893) 18 RI 224, 26 A 193, 19 LRA 824; Freezer v. Miller (1934) 163 Va 180, 176 SE 159, dissent op 160 Va 209, 182 SE 250.

in the garage, but he had been authorized by Heider (or at least the jury could have so found) to recover the mortgaged vehicles, including the motor and the other articles described in the criminal information. The real question in the case, therefore, is whether Baird continued to act under that authority when he commenced a criminal proceeding for the purpose, as he testified, of recovering those items of property. We think that this was a jury question, particularly in view of the close business and personal relationship between Heider and Baird and Heider's knowledge of what was going on. It may well be that Baird was acting, as he claimed, solely on his own account, but that was for the jury to say, and if they found, as evidently they did, that he was acting for Heider, the latter might, in these circumstances, be held liable as one who instigated the prosecution of Gowin. See *Odom v. Tally,* 160 Miss 797, 134 S 163.

The trial court did not err in denying the motions for nonsuit and directed verdict as to the defendant Heider.

## CONVERSION OF MORTGAGED VEHICLES

Motions for nonsuit and directed verdict were made jointly on behalf of both defendants and separate motions on behalf of Heider. They were denied and the rulings are assigned as error.

It is contended first, in support of the joint motions, that seizure of the mortgaged vehicles—a remedy preserved by the mortgage in case of a default —was justified because of violation by the plaintiff of a provision of the mortgage that if any attempt should be made to remove, injure or dispose of the mortgaged property or if the same should not be safely or properly

kept, cared for and protected by the mortgagor the mortgagee might declare the whole sum of both principal and interest due and payable without notice to the mortgagor and proceed at once to foreclose the mortgage. We have already, in another part of this opinion, set forth some of the evidence respecting the alleged abandonment of the mortgaged vehicles and their condition when repossessed. There was conflict concerning these matters and the question whether the provisions of the mortgage just referred to were violated was for the jury.

The mortgage contained a covenant that the mortgagor would not, without the written consent of the mortgagee, remove said property from the state of Oregon. Such a provision in a chattel mortgage is held to be for the benefit of the mortgagee and may be waived by him. *Globe Grain and M. Co. v. DeTweede N. & P. Hypotheekbank,* 69 F2d 418 (9th Cir. 1934); *Hardwick Bank & Trust Co. v. McFarland,* 43 F2d 807 (5th Cir. 1930). See, generally, 56 Am Jur 106, Waiver § 5. The evidence in this case is such as to have authorized a jury to find a waiver of the condition by the defendants.

It is further urged that defendants are justified because the plaintiff violated a provision of the mortgage which required him to keep the property insured. The evidence shows that the plaintiff failed to have liability insurance as required by ORS 767.195. The stipulation in the mortgage does not cover that type of insurance but only, as therein stated, insurance of the mortgaged property against "damage by fire, theft, collision and transportation, and wrongful conversion, and embezzlement * * *." Plaintiff's failure to have liability insurance did not constitute a breach of any covenant of the mortgage.

■ Next it is contended that the oral agreement extending the time of payment of the installment due July 10, 1959, was not valid or binding because there was no consideration for it, and that the mortgagee could lawfully exercise the right preserved in the mortgage to declare the whole sum of principal and interest due and payable without notice to the mortgagor and foreclose the mortgage by seizure and sale. We concur in the view that there was no consideration since Gowin himself testified that he was not bound to defer making the payment until expiration of the extended time. See 1 Williston on Contracts (3d ed) § 122. Nevertheless, we think that the court should not sanction a forfeiture for a default in the face of such an agreement, at least in the absence of a demand by the creditor. In *Reinkey v. Findley Electric Co.,* 147 Minn 161, 163, 180 NW 236, the court said:

> "There was no consideration for the extension. None was necessary. The defendant is seeking to enforce a forfeiture of the payments made and absolute title to the property sold. It cannot make nonpayment which it induced by an agreement to extend time, though the agreement is without consideration, a ground of forfeiture. The doctrine may be rested upon the ground of estoppel or of waiver."

See, also, *McCarron v. Com. Credit Trust,* 167 Minn 322, 209 NW 15; *National Cash Register Co. v. Richards,* 159 Mich 128, 123 NW 587; *Laird v. Byrd,* 177 Ark 1114, 9 SW2d 571; *Albert v. Grosvenor Investment Co.,* 3 LR 123, 127 (QB 1867); *Staunton v. Smith,* 6 Pa (22 Del) 193, 65 A 593; *Paine v. Bank of Ceres,* 59 Cal App 2d 242, 138 P2d 396; *Carmichael v. Guenette,* 61 Ga App 460, 6 SE2d 365; *Calhoun v. Universal Credit Co.,* 106 Utah 166, 178, 146 P2d 284; Estrich, Instalment Sales 628, § 311. The case is not greatly different from

*Kaller v. Spady,* 144 Or 206, 10 P2d 1119, 24 P2d 351, in which we held that the conduct of the mortgagees in a chattel mortgage inducing the mortgagor not to make payments of installments when tendered, the mortgagees stating that they did not need the money and to let the matter ride, estopped the mortgagees to "avail themselves of the provision of the contract which permitted them to declare the entire balance due, when an installment had been omitted, without first making a demand and affording the plaintiff a reasonable opportunity to pay the two omitted installments." 144 Or at 219.

Finally, it is urged that the extension agreement was obtained by misrepresentation by the plaintiff of his financial condition. Evidence of the plaintiff's receipts from his trucking business during the month of July 1959 is relied upon, but there is no evidence as to his expenses and we cannot say that the alleged false representation was proven as a matter of law.

Defendants contend that the plaintiff failed to produce sufficient evidence of damages. Plaintiff testified that the value of the mortgaged vehicles at the time and place of conversion was $22,000, less a reasonable amount to be deducted for the cost of necessary repairs, leaving a net value of $18,770. The argument for the defendants is directed to the weight rather than the competency of the evidence, save in one particular. It is suggested that under the recent decision of this court in *Highway Com. v. Assembly of God et al,* 230 Or 167, 368 P2d 937, the plaintiff was not qualified to testify as to the value of the property. We said in that case that a rule permitting an owner so to testify "simply because of the fact of ownership is of doubtful wisdom." We also said that we did not propose to

disturb that rule, but were of the opinion that it should not be extended to cases where the owner is a corporation. In this case the plaintiff was not an owner of property which he had never seen and knew nothing about. He had bargained for and purchased the mortgaged equipment, used it in the business of hauling logs, bought new parts for it, had it repaired, and by reason of his experience may be assumed to have acquired a knowledge of the value of logging trucks and trailers. In addition, his testimony came in without objection. The jury fixed plaintiff's general damages on the second cause of action at $2,000, which, under the instructions of the court, would represent the reasonable market value of the mortgaged equipment, as found by the jury, less the amount owing by the plaintiff under the mortgage. See 89 CJS 643, Trover and Conversion § 164; *Crutcher v. Scott Publishing Co.,* 42 Wash 2d 89, 102, 253 P2d 925; *Goldberg v. List,* 11 Cal2d 389, 393, 79 P2d 1087, 116 ALR 900. There was no error in submitting this question to the jury.

The joint motions under consideration were properly denied.

■ The ground of the separate motions of the defendant Heider is that there is no evidence of his participation in the repossession of the mortgaged vehicles. For the reasons stated in our consideration of Baird's agency for Heider in commencing the criminal prosecution against Gowin, the court did not err in denying these motions.

### CONVERSION OF THE HESKETH TRUCK AND TRAILER

The basis of this cause of action is duress practiced upon the plaintiff while he was in jail. The

complaint alleged that the conversion took place on September 1, 1959. The alleged fraud in obtaining from the plaintiff his signatures to motor vehicle powers of attorney is also set forth, though it is incorrectly alleged that this episode occurred "prior to said wrongful taking," whereas the evidence shows that it occurred on September eighteenth and that previously Baird had taken possession of the Hesketh truck and trailer.

The defendants moved jointly for a judgment of nonsuit and a directed verdict. Heider made like motions separately on the ground of failure to prove that Baird was his agent. As to the latter motions, what we have heretofore said on the question of Baird's agency disposes of this contention as applied to this cause of action.

The assignments of error in the defendants' brief directed to the denial of the joint motions raise the following questions:

(1) The evidence shows that on September twenty-sixth, eight days after Gowin was released from jail, Baird saw him in Halsey, Oregon, where he was working for Halsey Auto Wreckers and obtained his signatures to powers of attorney covering the Hesketh truck and trailer. The reason for obtaining these instruments, according to Baird, was that Peerless Trailer and Truck Service, which had a lien against the Hesketh trailer, required them in order to clear the title.

It is not disputed that Gowin signed these documents freely and voluntarily upon the mere request of Baird, and the contention is that this evidence demonstrates that Gowin's written authorization to his wife to deliver these vehicles and the other property in

question to Baird's agent was not the result of fraud or duress, but was freely given.

■■ The classic definition of conversion is "any distinct act of dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it." *Montgomery v. U. S. Nat'l Bank et al,* 220 Or 553, 568, 349 P2d 464. It is a conversion to obtain chattel property from another by duress, 89 CJS 549, Trover and Conversion § 40, or by fraud, ibid 559, § 55. See, also, Restatement, 1 Torts 638, § 252, comment d.

■ It is our opinion that the conversion, if there was one, occurred when Baird's agent took possession of the Hesketh truck and trailer. As we have indicated in the part of this opinion dealing with the cause of action for malicious prosecution, there was evidence sufficient to go to the jury on the question whether Gowin's consent to Baird taking the property in Idaho was the product of duress. If so, the defendants' subsequent alleged fraud in obtaining the powers of attorney from Gowin on September eighteenth becomes relatively unimportant to the issues involved in this cause of action. Gowin's conduct in signing the powers of attorney after he was released from jail when he was free from compulsion and acting under no fraudulent representations is competent evidence that his surrender of the property, in the first instance, was not induced by duress but by some other motive. It cannot, however, be held to be conclusive on that question. It was simply evidence to be weighed by the jury which, by its verdict, evidently determined the issue in accordance with the plaintiff's contention.

■ (2) The defendants contend that there is no proof of a demand and that a demand is necessary in this type of action. This was not one of the grounds

specified in support of the motions under consideration and the objection might therefore properly be ignored. Assuming, however, that the question is before us, it is sufficient to say that where a conversion has actually occurred there is no necessity of alleging and proving a demand and refusal. *Daniels v. Foster & Kleiser,* 95 Or 502, 507, 187 P 627. As numerous cases cited in the Annotation, 95 ALR 615 illustrate, when possession of goods is obtained by fraud, a conversion has taken place and the plaintiff is entitled to maintain an action of trover without previous demand. This is because there has been an original tortious taking by the defendant as opposed to the case of an original lawful possession in the defandant. *Genova v. Johnson,* 213 Or 47, 55, 321 P2d 1050. The same rule, of course, applies where chattels are obtained by duress. See Restatement, 1 Torts 638, § 252, comment d.

(3) It is contended that the evidence of damages is insufficient. Here, again, defendants urge that the testimony of the plaintiff as to value is incompetent. For the reasons hereinbefore given the contention cannot be sustained.

(4) It is argued that the evidence of fraud is not clear and satisfactory. We think that it was sufficient for submission to the jury. In connection with this contention defendants assert that it is not claimed that any pressure was put upon the plaintiff to obtain the authority from him to secure possession of the Hesketh truck and trailer. Such pressure was not specifically alleged in the complaint, but it was testified to by the plaintiff and was an issue for the jury.

The motions for nonsuit and directed verdict were properly denied.

Respecting the remaining assignments of error, what was said by Chief Justice Gibson of the Supreme Court of Pennsylvania may appropriately be quoted:

"The remaining exceptions form a reticulated web to catch the crumbs of the cause; and as they contain no point or principle of particular importance, they are dismissed without further remark." *Rogers v. Walker,* 6 Pa St 371, 375, 47 Am Dec 470.

For errors found in the admission of evidence in the cause of action for malicious prosecution the judgment in that action is reversed and the cause remanded for a new trial in conformity with this opinion. Upon such trial the court should determine the question of probable cause in accordance with the principles stated in *Patapoff v. Vollstedt's, Inc. et al,* 230 Or 266, 369 P2d 691; *Shoemaker v. Selnes et al,* supra, 220 Or at 580; *Gumm v. Heider,* supra, 220 Or at 19; *Kuhnhausen v. Stadelman,* supra, 174 Or at 310–311.

The judgments in the second and third causes of action for conversion are affirmed.

Affirmed in part; reversed in part.

**ON REHEARING**

*Norman K. Winslow,* Salem, argued the cause for appellants.

*Carlton R. Reiter,* Portland, argued the cause for respondent.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Lusk, Justices.

LUSK, J.

Petitions for a rehearing have been filed by both sides. We granted the appellants' (defendants') petition, which is directed solely to our affirmance of the judgment on the third cause of action, and that part of the respondent's (plaintiff's) petition which asserts error in our allowance of costs on appeal to the defendants. The remainder of respondent's petition is denied.

## APPELLANTS' PETITION FOR REHEARING

The third cause of action is in trover for a conversion of the so-called Hesketh truck and trailer which is also referred to in the testimony as the "Rause truck and trailer" and "the freighter". On this cause of action the jury returned a verdict for the plaintiff in the amount of $7,000 general damages and $15,000 punitive damages. The verdict for punitive damages was subsequently set aside by the trial court and judgment for the plaintiff entered in the sum of $7,000.

The ground of defendants' petition is that this Court's affirmance of the judgment was based upon a theory not pleaded in the complaint. After alleging that on, to-wit, September 1, 1959, plaintiff was the owner and entitled to the immediate possession of the vehicles in question, and that their reasonable market value in the county of Kootenai, Idaho, and in Yamhill county, Oregon, was $14,000, the complaint continued:

"IV.

"That on, to-wit: the 1st day of September, 1959 the defendants and each of them wrongfully and unlawfully took said vehicle from plaintiff and con-

verted the same to defendants' own use without the consent of plaintiff;

"V.

"That prior to said wrongful taking the defendants induced plaintiff to give consent to defendants for them to take possession of said truck and trailer in the following manner:

"Defendants had previously been delivered a written assignment of plaintiff's interest in a land sale contract which plaintiff and his wife had entered into in February of 1959 with one James M. Davis and Lucille Davis, and which land sale contract pertained to land situated in a part of the Joseph Brisbine Donation Land Claim No. 51 in T2S, R3W of the Willamette Meridian; that said assignment has been made to defendants as additional collateral in security and in connection with a certain chattel mortgage transaction; that on or about the 18th day of September, 1959, defendants represented to plaintiff that if he should execute a power of attorney which would enable the defendants to obtain a transfer of title to the aforedescribed vehicles then upon delivery of said power of attorney to them by plaintiff, and upon defendants obtaining possession of said vehicles, defendants would reassign plaintiff all of their right, title and interest in the aforementioned real estate contract held by them as collateral; that plaintiff believed said representations to be true and was incarcerated in the Yamhill county jail at said time and was assured by defendants that unless such consent were given plaintiff would not be released from jail and other charges would be preferred against him; that plaintiff in reliance upon said representations and in fear of reprisals in fact executed and delivered a motor vehicle title transfer power of attorney to defendants which thus enabled them

thereafter to take possession of said vehicles and to cause the titles to said vehicles to be registered in defendants' name; that at said time defendants did not intend to reassign said land sale contract to plaintiff but deceived plaintiff and coerced him and acted intentionally and maliciously; that defendants thereafter refused to reassign said land sale contract;

## "VI.

"That by reason of the premises plaintiff alleges that the purported consent given defendants to take possession of the afore-described vehicles was a nullity and was fraudulently obtained;".

We shall now refer to the evidence bearing upon the question.

The case has its genesis in the purchase by the plaintiff Gowin from the defendant Baird of three log trucks and trailers and the execution by Gowin of a chattel mortgage on this equipment to secure the purchase price. As additional security, Gowin assigned to Baird his interest in a contract of sale of a farm. The mortgage was assigned by Baird to Heider for a valuable consideration. Later Gowin acquired the Hesketh truck and trailer, and transferred the motor from one of the mortgaged trucks to the Hesketh truck and departed for Idaho, leaving behind the mortgaged vehicles, but taking with him stakes, chains and binders and other equipment which Baird claimed to be his property. Baird swore to a criminal information charging Gowin with larceny by bailee of the motor above referred to and several other items of property. Gowin was apprehended in Coeur d'Alene, Idaho, brought back to McMinnville, Oregon, and lodged in jail there on or about August 31, 1951, and

so remained until September 18, 1959, on the charge preferred by Baird, and other charges. During this time Baird met with Gowin in the jail twice, on September 1 and September 18, 1959. On both occasions the sheriff of Yamhill county, Wallace Mekkers, was present.

It is in evidence that before Gowin left for Idaho he removed the tires and wheels from the mortgaged vehicles and sold them to a concern in Portland referred to as Burns Brothers. Baird testified as an adverse witness for the plaintiff that Gowin told him that "he would give me his equity in the Diamond T [the Hesketh truck] and trailer and farm and some fence posts and rolls of barbed wire still laying at the place, and some old peat buckets if I wouldn't push Burns Brothers for buying this property. That was our agreement in front of the Sheriff."

As a witness in his own behalf Baird testified that he told Gowin that Burns Brothers admitted buying the tires, but that they had already sold them and that Gowin said that "if I didn't press the charges on Burns that he'd give me the truck and trailer and everything else up there to get away from having another charge brought against him;" that Gowin told him to "go and get" the property and gave him a letter to Mrs. Gowin (who remained behind in Coeur d'Alene after Gowin was arrested) authorizing her to turn over to him the Hesketh truck and trailer and various articles of equipment. Baird thereupon sent his agent, Aebi, to Coeur d'Alene with the letter, and Mrs. Gowin delivered the property to Aebi who brought it back to Oregon. He left the trailer with Peerless Trailer and Truck Service in Portland and drove the

truck to Baird's garage in Sheridan. Baird testified that some $4,200 was owing on the purchase price of these vehicles and that he paid it off.

Gowin's version of what took place at the first meeting was quite different from Baird's. In answer to a question by his counsel as to what conversation he had about the Hesketh truck and trailer, he answered:

"And they wanted their motor back in the truck and he says, 'Stakes, chains and binders —' Mr. Baird was talking. He said they wanted their stakes, chains and binders also, and I told them they could have the stakes, chains and binders but not the truck—the motor had already been changed and the Sheriff says, 'You better try to get along here. Try to cooperate in this matter.'"

Gowin's testimony continued:

"Q Why were you going to give them the stakes, chains and binders when they were yours? Would you explain that to the jury?

"A Well, I was under some pressure there, and I needed to get out of jail.

\* \* \* \* \*

"THE WITNESS: I needed to get out of the jail. I was under a good deal of pressure and I figured I could sacrifice some and retain the rest, but, then, in the conversation—the exact words I wouldn't recall—still on the same subject there though, of the stakes, chains and binders, and Mr. Baird made out the lists. As I called off by memory what parts was—including my parts; my fuel oil and so forth—grease—and he says, 'I'll need a letter of signature, and I said, 'No.' and the Sheriff says, 'Never mind, it's going to be picked up by warrant anyway.'"

Although Gowin testified that "I told them they could have the stakes, chains and binders but not the truck," nevertheless, it is shown without contradiction that he did sign the letter authorizing his wife to deliver the Hesketh truck and trailer to Baird.

At another point in his testimony, with reference to the September first meeting, Gowin testified: "I told him if he wanted the stuff back he could have it, but he'd have to go get it. He said, 'Don't worry about that, I have the truck repossessed in Idaho.' " He explained that by "the stuff" he meant the stakes, chains and binders.

Regarding the meeting between Baird and Gowin on September eighteenth, the latter testified that Baird said:

"'We have the truck. The truck has been back since around the 4th—' somewhere in there—in that neighborhood, and that he had possession and that I still was under the impression that it had been picked up on a warrant, and, due to the release of the plates—a promissory release of the plates to get out—the Sheriff was putting a little pressure here and there."

He further testified that on that occasion Baird induced him, by a fraudulent promise, to sign blank powers of attorney covering the mortgaged vehicles and the Hesketh truck and trailer so that Baird would be able to have the titles to these vehicles transferred into his name. The promise was that if Gowin would sign the powers of attorney Baird would reassign to him the contract of sale of Gowin's farm. Baird denied this testimony, but, as counsel for the defendants freely admits, the issue of fraud was for the jury.

On this evidence we held as follows:

"It is our opinion that the conversion, if there was one, occurred when Baird's agent took possession of the Hesketh truck and trailer. As we have indicated in the part of this opinion dealing with the cause of action for malicious prosecution, there was evidence sufficient to go to the jury on the question whether Gowin's consent to Baird taking the property in Idaho was the product of duress. If so, the defendants' subsequent alleged fraud in obtaining the powers of attorney from Gowin on September eighteenth becomes relatively unimportant to the issues involved in this cause of action. * * *" 386 P2d at 18.

While we are still of the opinion that the evidence is sufficient to support a finding that Baird secured the letter of authority from Gowin and the possession of the vehicles by duress we are, nevertheless, convinced, after reargument and re-examination of the question, that the judgment cannot be sustained on that basis, for that is not the wrongful act alleged in the complaint. The complaint alleges a conversion that occurred at a later date and by other means, namely, the fraudulent promise to reassign the land sale contract to Gowin, coupled with a charge of duress, by all of which Gowin was induced to sign the power of attorney. We attach no importance to the date as such, as, generally speaking, the date is not so material but that a conversion may be proved to have been on a different date than that alleged. *Aldrich v. Higgins,* 77 Conn 370, 59 A 498. Here, the complaint alleged two dates, September 1 and September 18, but the plaintiff chose to state the circumstances of the conversion, and the means by which it was accomplished, on September 18. He could not recover by proof of a

conversion at an earlier date accomplished by entirely different means.

The complaint alleges that *"prior to said wrongful taking"* the plaintiff was induced by the false promise to "execute a power of attorney which would enable the defendants to obtain a transfer of title" to the vehicles, and that the promise would be carried out "upon delivery of said power of attorney" to defendants and "upon defendants obtaining possession of said vehicles," and that the plaintiff, relying upon the promise and in fear of reprisals, executed a motor vehicle title transfer power of attorney to defendants, which "thus enabled them thereafter to take possession of said vehicles and to cause the titles to said vehicles to be registered in defendants' name."

The evidence is that more than two weeks before this Baird had gotten possession of the vehicles, not through the false promise and duress alleged in the complaint, but by securing Gowin's signature to a letter of authority addressed to Mrs. Gowin. The evidence that this letter and possession of the truck and trailer through it were obtained by duress is what caused us to hold in our former opinion that it was at that time, if at all, that the conversion took place.

As an answer to this position counsel for the plaintiff on the oral argument on rehearing urged the following: Aebi was a dual agent. He was agent for Baird to bring back the stakes, chains, and binders and for Gowin to bring back the truck. The conversion was accomplished through a series of steps, and conversion of a motor vehicle is not complete until the wrongdoer obtains a certificate of title so that the title may be transferred through the State Department of Motor Vehicles. The first step was the obtaining

by Aebi for Gowin of custody of the truck. At that time Baird had no intention of keeping the truck and the conversion was completed when the power of attorney was fraudulently obtained. Counsel stated that "the letter was given voluntarily, but the truck was not given to the defendants at that point."

The argument is a complete about-face on the part of counsel for the plaintiff, who contended in his brief on the original submission that the defendants "extorted" the letter from Gowin to Mrs. Gowin by telling him "he would stay in jail until they 'got the stuff back'", and that the conversion was completed when Aebi obtained possession of the vehicles in Idaho and brought them back to Oregon. More importantly, there is no room in the evidence for the claim that in doing so Aebi acted as agent for Gowin. The sole question was whether Gowin gave the letter freely and voluntarily or as the result of duress. If it was the latter, there was a conversion. As previously stated, this was not the conversion pleaded by the plaintiff. Neither was it the issue submitted to the jury in the court's instructions, which dealt only with the defendants' alleged fraud and duress in obtaining the power of attorney on September eighteenth.

Nevertheless, we think that the evidence justified the instructions and supports the judgment.

There was no evidence that, as the plaintiff alleged, the power of attorney obtained by the defendants through the asserted fraud enabled them to take possession of the vehicles or to secure registration of them in their own names, but that does not end the inquiry. The question is, does the conduct of the defendants alleged and proven constitute such an exercise of do-

minion over the property, in exclusion of the plaintiff's right, as to amount to a conversion.

■ It is not necessary to a conversion that there should be a manual taking of the chattel by the defendant, or that it should be shown that he has applied it to his own use; a withholding of possession under a claim of title inconsistent with the title of the owner is sufficient, 2 Cooley on Torts (4th ed) 499-500, § 331; 89 CJS 533-534, Trover and Conversion, § 3. Dean Prosser says that "a mere assertion of ownership, without any disturbance of possession, or any other interference with the right to it, is not sufficiently serious to be classed as a conversion," but "[a] claim of title by one who is in possession, which reasonably implies that the owner will not be permitted to obtain the goods, will be enough." Prosser on Torts (2d ed) 77. Supporting the text are *Baker v. Beers,* 64 NH 102, 6 A 35; *Adams v. Mizell,* 11 Ga 106; *Oakley v. Lyster,* 1 KB 148 (1931). In the case last cited, the defendant had not even taken possession of the property, described as "hard core and tar macadam," which belonged to the plaintiff and had been deposited by him on land which he rented for that purpose. The land was later purchased by the defendant who never went into possession. Nevertheless, a letter written by the defendant's solicitor to the plaintiff warning the latter that if he attempted to remove "the stuff" he would become a trespasser was found by the court to be sufficient evidence of a conversion.

■ We have no difficulty in holding that one who, for the purpose of getting the title to a motor vehicle registered in his own name, obtains from the true owner by fraud or duress a power of attorney which would enable him to accomplish that purpose, is guilty

of an unlawful interference with the true owner's dominion over the property, where, as here, the wrong-doer is in possession of the property. That the power of attorney proved to be insufficient for its intended purpose, as the evidence indicates, is not material. Neither is it material that the possession of the defendants was unlawful. See 89 CJS 547, Trover and Conversion § 37, where it is said:

"Regardless of whether he came into possession of the property lawfully or unlawfully, a person in possession of the personal property of another is guilty of conversion where he makes an unfounded claim or assertion of ownership or title thereto, or treats or deals with the property as owner. * * *"

Thus, the evidence was sufficient to show a distinct act of dominion wrongfully exerted by the defendants over plaintiff's property on September eighteenth, and a conversion, as alleged in the complaint. In the circumstances of this case, the plaintiff had his election to make either the original conversion or the later one the basis of an action in trover.

In the particulars hereinabove indicated, our former opinion is modified, but the decision affirming the judgment on the third cause of action is adhered to.

## RESPONDENT'S PETITION FOR REHEARING

On this appeal the court has reversed the judgment for the respondent on one cause of action and affirmed the judgments on the other two. Both the appellants and the respondent filed cost bills. On objections of each party to the other's cost bill, we sustained the appellants' objections, but have granted a rehearing

because the problem involved is a recurring one and our decisions regarding it are not uniform.

Upon the argument neither side claimed the right to recover all its costs. Counsel for the respondent suggested that a division of one-third to the appellants and two thirds to the respondent would be fair, just as though there had been three separate lawsuits. Counsel for appellants thought that there should be an apportionment of the expense of preparing the transcript of testimony and of printing the briefs based upon an allocation of the portions of the testimony and the briefs properly referable to each cause of action. He admitted that this would be a difficult task. In a case like this where much of the testimony related to all three causes of action, we think it would be a Herculean one.

Both counsel assumed, not without justification in our decisions, that this court has discretion in the matter. Whether it has or not is, we think, the primary question.

The first statute relating to costs was passed in 1862, Deady's Civil Code, ch 6, Title V. Section 542 (General Laws of Oregon 1845-1864, pages 287-288) provided:

"Costs, when allowed to either party, are as follows:

"1. In the supreme court, on an appeal, to the prevailing party, fifteen dollars;

"2. In the circuit court, to the prevailing party, when judgment is given without trial of an issue of law or fact, or upon an appeal, five dollars; when judgment is given after trial of an issue of law or fact, ten dollars;

"3. In the county court, one-half the amount allowed in the circuit court.

"But when on an appeal to the supreme or cir-
cuit court a new trial is ordered, or a decision given
modifying the judgment appealed from, the costs
on appeal shall be allowed or not, in the discretion
of the appellate court."

Section 543 (now ORS 20.020) provided:

"A party entitled to costs shall also be allowed
for all necessary disbursements, including the fees
of officers and witnesses, the necessary expenses of
taking depositions by commission or otherwise, the
expense of publication of the summons or notices,
and the postage where the same are served by mail,
the compensation of referees, and the necessary
expense of copying any public record, book or docu-
ment used as evidence on the trial."[1]

In a suit in equity, however, costs were allowed to
the prevailing party "unless the court otherwise di-
rects." Deady, section 544, now ORS 20.030.

The statute regarding costs on appeal in a law
action remained unchanged until 1907, when the pro-
vision that when "a new trial is ordered, or a decision
given modifying the judgment appealed from, the costs
on appeal shall be allowed or not, in the discretion
of the appellate court", was dropped, General Laws
of Oregon 1907, ch 181, § 2; and ever since then the
law of this state has provided that in the Supreme
Court costs shall be allowed to the prevailing party.
See ORS 20.070 (1).

Turning now to our decisions we find that in the
earlier cases after 1907 the court applied the statute
as it was written, that is, costs were allowed to the
prevailing party, *Gardner v. Kinney,* 60 Or 292, 296,
117 P 971 (1911); *Lemler v. Bord,* 80 Or 224, 230, 156

---

[1] Since the party entitled to costs is also entitled to disburse-
ments, the word "costs" is used as referring to both.

P 427, 1034 (1916); *Propst v. William Hanley Co.*, 94 Or 397, 404, 185 P 766 (1919). In *Gardner v. Kinney,* the plaintiff was ordered to remit $285 of a judgment for $1,171 or suffer a reversal and the defendant was awarded costs, the court saying, per McBRIDE, J.: "As defendant has been put to the trouble and expense of an appeal, he will recover his costs in this court in any event." There was a similar ruling in *Lemler v. Bord,* where there was a judgment for the plaintiff for $270.60 on a first cause of action and a judgment for $10 on a second cause of action. The former judgment was affirmed, the latter set aside, and it was held that defendant was entitled to costs as the prevailing party. So, also, in *Propst v. William Hanley Co.,* when a judgment for the plaintiff for $1,631 was reduced on appeal to $148.33.

The first mention of Article VII, § 3, of the Constitution in this connection was made in *Lemler v. Bord.* That section provides, in part, that "if, in any respect, the judgment appealed from should be changed, and the supreme court shall be of opinion that it can determine what judgment should have been entered in the court below, it shall direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the supreme court." Respecting this provision the court said:

> "It must be remembered, however, that it is a judgment and not a decree which is to be entered under that clause. The incidents of the former will therefore follow, and the question must be settled on the basis of a judgment as distinguished from a decree." 80 Or at 231-232.

The court then referred to section 565, L.O.L., providing that costs in the supreme court on an appeal

are allowed to the prevailing party and said that wherever costs are allowed at law, "they follow as a matter of course one way or the other."

In 1918 the court first announced that Article VII, § 3, of the Constitution conferred upon it a discretionary power to determine a question of costs. This was in the case of *Stabler v. Melvin,* 89 Or 226, 173 P 896 (1918) in which, pursuant to the constitutional amendment, a judgment for fraud was reduced from $1,411 to $750 and it was held that neither party was entitled to costs. The court said:

> "It is our opinion that the power given to this court, under this section, to enter a judgment upon the record carries with it the power to award costs on equitable principles, and to give or to deny costs to either party on appeal." 89 Or at 232.

Other cases invoking the asserted power are: *Olson v. Heisen,* 90 Or 176, 175 P 859 (1918); *Miller Lum. Co. v. Davis,* 94 Or 507, 185 P 462, 1107 (1919); *Levine v. Levine,* 95 Or 94, 187 P 609 (1920); *Obermeier v. Mortgage Co. Holland-America,* 123 Or 469, 259 P 1064, 260 P 1099, 262 P 261 (1927); *Wood et al v. Sprague et al,* 165 Or 122, 106 P2d 287 (1940).

*McKinney v. Nayberger et al,* 138 Or 203, 220, 295 P 474, 2 P2d 1111, 6 P2d 228, 229 (1931), *Patterson v. Horsefly Irrigation Dist.,* 157 Or 1, 69 P2d 282, 70 P2d 36 (1937); and *State v. Cummings,* 205 Or 500, 534, 288 P2d 1036, 289 P2d 1083 (1955), mark a departure from the decisions just referred to. Recognizing that the statute regarding costs is controlling, they hold that on affirmance or outright reversal of a judgment, the party in whose favor the decision is rendered is the prevailing party and entitled to recover costs.

*State v. Cummings,* by strong implication at least, repudiates the resort to Article VII, § 3, of the Constitution in some of the earlier cases. Referring to *Stabler v. Melvin* and similar cases, the court said that they

"* * * were decided before the adoption of Oregon Laws 1921, ch 322. That statute is now ORS 20.310. Accordingly, when the four cases just cited were decided, no enactment of this state entitled the prevailing party, upon appeal in law actions, to an award of costs and disbursements.

"We have no right to ignore the demands of ORS 20.310. The prevailing party—in this case the appellant—is entitled to costs and disbursements." 205 Or at 537.

The 1921 enactment referred to by the court in that case, and which is now ORS 20.310, reads:

"When costs are allowed to the prevailing party on appeal to the supreme court the appearance fees, trial fees, attorney fees, as provided by law; the necessary expenses of transcript or abstract, as the law or rules require; the printing required by rule of the court, and the transcript of testimony or other proceedings, when necessarily forming part of the record on appeal, shall be taxed in the supreme court as costs of the appeal."

As we have seen, however, the statute has provided since 1907 that the prevailing party is entitled to costs on appeal in the supreme court, and the 1921 enactment, therefore, instead of creating the right to recover costs, merely enumerated the recoverable items, including the expense of the transcript of testimony which theretofore had been held to be not taxable in the supreme court, but only in the circuit court. See *Allen v. Standard Box & Lumber Co.,* 53 Or 10, 18-19, 96 P 1109, 97 P 555, 98 P 509 (1908); *Sommer v.*

*Compton,* 53 Or 341, 100 P 289 (1909); *McGee v. Beckley,* 54 Or 250, 254, 102 P 303, 103 P 61 (1909).

█ We now hold that Article VII, § 3, of the Constitution cannot be resorted to for the purpose of awarding costs on appeal differently from the command of the statute. That section authorizes this court, when the entire record in a case tried by a jury is brought before it and the court is of the opinion that the judgment was such as should have been rendered, to affirm the judgment, notwithstanding any error committed during the trial. The section further provides, as previously stated, that if the judgment should be changed and the court shall be of the opinion that it can be determined what judgment should have been entered in the court below this court may "direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the supreme court." The power of this court to retry the facts of a case tried by a jury where error appears, first asserted in *Hoag v. Washington-Oregon Corp.,* 75 Or 588, 144 P 574, 147 P 756 (1915) and frequently exercised since, was challenged in the dissenting opinion of Mr. Justice Rossman in *Shelton v. Lowell et al,* 196 Or 430, 249 P2d 958 (1952) and has not been resorted to since the decision in that case, notwithstanding the frequent urgings of litigants. But whether the power exists or not, it cannot be said that this court has been authorized by the Constitution to convert an action at law, in which parties are entitled to a trial by jury, into a suit in equity. See *Lemler v. Bord,* supra.

█ The constitutional provision was not intended to modify or repeal the statute governing costs on appeal. Even though it could properly be said that, when the court affirms a judgment or renders a different one

pursuant to Article VII, § 3, it is authorized, as an incident to the exercise of that power, to determine the allowance of costs on an equitable basis, there is no justification for construing the provision as conferring on the court a separate and independent power to deal with a question of costs in that fashion. This case was decided wholly without regard to Article VII, § 3.

"Costs are purely statutory. At common law they were unknown, and were not recoverable, and were not adjudged in the judgment of a case." *McKinney v. Nayberger,* supra, 138 Or at 220. We take it to be now settled by our recent decisions that under our statute costs and disbursements are allowed as a matter of course to the prevailing party on the affirmance or reversal of a judgment. It now remains to be determined, and this is the precise question before the court in this case, whether any different rule applies where a judgment is modified, and what is to be regarded as a modification for the purposes of the rule.

The 1907 amendment, it will be remembered, eliminated two exceptions to the provision of the original statute allowing costs on appeal to the prevailing party, namely, when a new trial is ordered and when there is a modification of the judgment. In such instances the court was formerly granted power to allow costs or not in its discretion. The effect of the amendment was to withdraw that discretion and leave the classes of cases theretofore excepted subject to the mandate that the prevailing party shall recover costs. In *Patterson v. Horsefly Irrigation Dist.* and *State v. Cummings,* both supra, we held after extensive review of our prior decisions that when a new trial is ordered the appellant is the prevailing party and entitled to

costs. Who is. the prevailing party when a judgment is modified? We think that the answer to that question must necessarily depend on the extent of the modification. It may be so trifling or unsubstantial that the decision amounts to an affirmance. See *Steel v. Farrell,* 31 Or .169, 49 P 974 (1897), where a decree was affirmed notwithstanding an error of $2.25. Whether a modification is of sufficient importance to put the party securing it in the position of the prevailing party within the meaning of the costs statute must be determined upon the facts of each case, 14 Am Jur 63, Costs § 98.

In any event, it is clear that under the statute there cannot be two prevailing parties on opposite sides of the same case. Nor can a decision disallowing costs be justified. As we said in *Lemler v. Bord,* supra: "It is well settled that in actions at law costs must be allowed to one party or the other". 80 Or at 232. There is no provision for an apportionment of costs (cf. *Phipps v. Taylor,* 15 Or 484, 488, 16 P 171 (1887)) and we are aware of no decision of this court apportioning costs in a law action except *Dixon et ux v. Schoonover et ux,* 226 Or 443, 455, 359 P2d 115, 360 P2d 274 (1961) where the plaintiffs, who were both respondents and cross-appellants in this court, were successful in resisting the defendants' appeal, but unsuccessful on their cross-appeal.

The rule is the same as that stated in *Propper v. Chicago, Rock Island & Pacific Railroad Co.,* 237 Minn 386, 408, 54 NW2d 840, 35 ALR2d 459, quoting from *Hildebrandt v. Hagen,* 228 Minn 353, 360, 38 NW2d 815, 820:

"It is well settled here that the modification of a judgment entitles the party obtaining the same

on appeal to costs and disbursements. This is true even though the disbursements were made in providing a record and brief on the issues upon which the party obtaining the modification did not prevail.  *  *  *"

In the present case the appellants obtained a substantial modification when this court reversed the judgment for malicious prosecution. They were the prevailing parties and entitled to statutory costs in the sum of $15, ORS 20.070, and their necessary disbursements pursuant to ORS 20.310. Bearing in mind that the power of the court to allow costs is wholly statutory and that the right to recover disbursements depends on the right to recover costs (i.e., statutory costs) we cannot, without doing violence to the statute, treat this case as three lawsuits and three appeals, in one of which the appellants are the prevailing parties and in the other two the respondents, and allow the appellants one-third and the respondent two-thirds of the statutory costs and disbursements. Nor can we resort to some other formula of apportionment deemed to be equitable. Indeed, the necessary—and absurd—result of treating the case as three lawsuits would be to award two statutory costs to the respondent as the prevailing party in two of them.

The original statute allowed this court a measure of freedom in dealing with such problems which unfortunately has since been denied it. As has been before observed, a change does not always denote progress or improvement. Another change in the direction of the 1862 Act governing costs on appeal in actions at law may seem to the legislative assembly to be desirable.

We adhere to our decision allowing costs to the appellants.