Argued March 13, affirmed as modified October 22, 1958

# RUTH ET UX v. HICKMAN
## 330 P. 2d 722

*Harry G. Spencer,* Salem, and *Edward A. Butler,* Eugene, argued the cause for appellant. On the brief were Harris, Butler & Husk and Vernon D. Gleaves, Eugene, and Harry G. Spencer, Salem.

*J. M. Copenhaver,* Redmond, argued the cause for respondents. On the brief were Cunning & Brewster, Bend, and Thomas Boeke, and J. J. Thalhofer, Redmond.

Before PERRY, Chief Justice, and ROSSMAN, LUSK and McALLISTER, Justices.

McALLISTER, J.

This is a suit in equity brought by the plaintiffs, Adrian Ruth and Mildred Ruth, his wife, to rescind a contract entered into by them for the purchase of a general insurance agency from the defendant, C. Von Hickman. From a decree in favor of plaintiffs, the defendant has appealed.

The contract involved in this suit was executed on March 31, 1954. For a number of years prior to that date, the defendant Hickman had been engaged in the insurance business in Eugene under the name of Hickman Insurance Agency. The business was divided into a life insurance agency, to which Hickman devoted substantially all of his time, and a general insurance agency managed by defendant's cousin, Dean Hickman. The general insurance agency is the subject matter of this suit.

On February 28, 1954, the following advertisement appeared in The Oregonian, having been placed therein by Hickman:

"General insurance business for sale in Eugene; premium income about $130,000; sale price $25,000. Also a corporation with a loss carry over. Write BV, 977, Oregonian."

In response to this ad Adrian Ruth, who lived near Redmond, wrote a letter asking for more particulars. He inquired specifically about gross profit, expenses and net profit.

In reply Hickman sent Mr. Ruth a copy of a letter previously written by defendant to another prospective purchaser. This letter contained the following statements about the general insurance agency:

"This business has been growing from year to year and is now doing from $125,000 to $130,000 in premiums each year."

"The gross income from all policies on the books is approximately $27,000 as shown by an audit made in October."

"The business has been handled by my cousin, Dean Hickman, and one girl with occasional outside help for bookkeeping. Dean's salary is $500 and the girl's salary is $275. The office rent is $150

monthly. Utilities and janitorial service averages approximately $35 monthly."

"My reason for wishing to sell is this: I was the owner of the Burgoyne Motor Company which lost about $20,000 and I wish to sell the Burgoyne Motor Company and the Hickman Insurance Agency as one parcel in order that I can take capital gains against capital loss."

In response to the above letter, Mr. Ruth wrote Hickman on March 3, 1954, stating, among other things, that he would not be able to pay the purchase price in cash. The letter also contained this statement, "I know nothing about the insurance business and if this is essential, then that is another reason for not taking up your time."

Upon receipt of this letter Hickman called Mr. Ruth at Redmond by telephone. In response to this call, the Ruths met Hickman in his office in Eugene on March 7, 1954. There is a sharp conflict in the testimony concerning the statements made by Hickman and the conversations between the parties at this and later meetings. It is agreed that at the meeting Hickman advised the plaintiffs that the selling price of $25,000 quoted in the ad was in error and should have been $35,000, which he was asking for the business. After the initial meeting Mr. Ruth made two trips to Eugene to continue the negotiations and returned again about March 29th and stayed in Eugene until the contract was executed on March 31, 1954.

The Hickman insurance agency was not incorporated. However, Hickman owned all of the stock of Burgoyne Motors, the corporation mentioned in his advertisement and letter to plaintiffs. This corporation had been engaged in the automobile business, had quit business after sustaining substantial losses and, for federal tax purposes, was entitled to a loss carry-

over of about $19,000. Burgoyne Motors owed Hickman about $14,000, which was evidenced by the promissory note of the corporation payable to Hickman.

The contract required Hickman to transfer the assets of his general insurance agency to Burgoyne Motors, to change the name of the corporation to Hickman Insurance Agency, Inc. and to transfer all of the stock of the corporation to plaintiffs. It was represented by Hickman that a substantial savings in federal taxes could be effected by having the insurance business transferred to the corporation so that the earnings of the insurance business could be offset against the losses sustained by the corporation while it had been in the automobile business.

Plaintiffs agreed to pay the purchase price of $35,000 as follows:

(a) $7,000 in cash;

(b) $10,000 as required by their promissory note in that sum payable to Hickman and secured by a mortgage on plaintiffs' home;

(c) $4,000 as required by their promissory note in that sum payable to Hickman and secured by a pledge of all the stock of the corporation; and,

(d) $14,000 as required by a promissory note executed by the corporation to Hickman, payment of which was guaranteed by plaintiffs and their guaranty secured by a pledge of all the stock of the corporation.

In their amended complaint plaintiffs alleged that prior to the sale, the defendant represented to them that: (1) the annual premium income of the agency was approximately $125,000 to $130,000; (2) that the annual gross income from commissions upon the annual premium income was approximately $27,000; and (3) that the cost of doing business was about $1,000 per month.

Plaintiffs also alleged that said representations were false in that (1) the annual premium income was only about $75,000; (2) the annual gross income from commissions was less than $18,000; and (3) the cost of doing business exceeded $1,000 per month. Plaintiffs further alleged that they had a right to and did rely on said representations and were induced thereby to enter into the contract.

Defendant's answer put in issue the material allegations of plaintiffs' complaint and prayed for specific performance of the contract.

The trial court found that for the purpose of inducing the Ruths to purchase the agency, Hickman made the following material representations of fact:

"1. That . . . 'this business has been growing from year to year, and is now doing from $125,000.00 to $130,000.00 in premiums each year.

"2. To the effect and substance that the insurance business grossed profits from premiums in the approximate amount of $27,000.00 annually."

The court further found that (a) the Ruths had a right to and did rely on said representations and were induced thereby to enter into the contract; (b) that said representations were false in that the annual premium income of the agency had been substantially less than $50,000 each year and that the annual gross income of said business had not exceeded $5,000 annually; and (c) that the plaintiffs did not know or have information to put them on notice that said representations were false until about July 21, 1954. This action to rescind the contract was filed on August 6, 1954.

In his brief Hickman concedes that he misrepresented the annual premium income of the agency when he said it was from $125,000 to $130,000. He also is willing to assume that his statement that "the gross

income for all policies on the books is approximately $27,000," was intended to convey the impression that the *annual* gross income was $27,000. Hickman concedes that the annual premium income and the annual gross income of the agency from commissions were both substantially less than as represented.

Hickman contends that before the contract was signed he and Dean Hickman had explained to plaintiffs that the figure of $125,000 to $130,000 was the projected total premium income for the period of years embraced within the expiration dates of all policies on the books of the agency and that such sum did not represent the amount of the annual premium income. Defendant further contends that he explained to plaintiffs at the same time that the sum of $27,000 represented the projected total gross income for the same years from all the policies on the books of the agency instead of the annual gross income from such policies. Defendant finally contends that, because plaintiffs learned from him and Dean Hickman of the falsity of the statements about annual premium income and annual gross income contained in the advertisement and letter quoted above, they had no right to rely on such misrepresentations when they signed the contract.

To support his contentions defendant relies on a tabulation of the projected premium income from all policies on the books of the agency made as of August 31, 1953 by another prospective purchaser. The recapitulation of this tabulation covered a large sheet ruled in columns commonly used by accountants. This recapitulation was shown to plaintiffs on March 7th by Hickman. It showed a total premium income of $126,881.26 from all the policies on the books of the agency. The statement contained nothing to indicate the period of years over which this income

would be received by the agency. It did bear, at the bottom, the following notation: "Oct-'53-'54—81,869.78" Defendant contended that this notation showed a projected premium income of $81,867.98 for the period of 12 months from October 1953 to October 1954.

The conclusion to be drawn from the array of figures on the recapitulation was apparently clear to the prospective purchaser who made it. It is possible that the same conclusion might be drawn by a person with experience in the insurance business and familiar with its accounting procedures. Whether or not the statement was adequately explained to plaintiffs or understood by them was one of the issues of fact in the case. Plaintiffs testified in effect that the statement, showing as it did a total premium income of $126,881.26, only confirmed their prior understanding that the total *annual* premium income of the agency was between $125,000 to $130,000.

We think it is significant that no profit and loss statements for prior years were shown plaintiffs. Mr. Ruth testified that during the first conference on March 7, 1954, he asked for a profit and loss statement but was advised by Mr. Hickman that the only statement which had been prepared included both the life insurance and general insurance businesses and did not show the condition of the general insurance agency separately. When Mr. Ruth suspected in July 1954 that the business had been misrepresented, he had the books examined by an accountant. This audit revealed that the general insurance portion of Hickman's business had made only $3,009.21 in 1953 without any charge for office rental. If rent had been charged against this portion of the business, the net profit would have been substantially less. In any event, the profit was shockingly small when compared

to the annual profit of approximately $15,000 represented in Hickman's letter to plaintiffs. The books further showed that the portion of the business sold to plaintiffs sustained a loss of $10,555 during the year of 1952. Hickman did not challenge the accuracy of these figures for either year, but claimed that the substantial loss in 1952 resulted from a sale that was charged back but the nature of the sale which caused this loss was not explained.

The general rules of law applicable to suits for rescission are now well settled. They were last stated by this court in *Brown et ux. v. Hassenstab et ux.*, 212 Or 246, 319 P2d 929, a case similar in many respects to the case at bar. It would serve no useful purpose to repeat such rules here.

We also deem it unnecessary to recite in further detail the conflicting testimony of the parties. The able trial judge, who heard and observed the witnesses, found in favor of the plaintiffs. We have carefully considered all of the evidence and are satisfied that the decree should be affirmed except as to some minor provisions hereinafter noted.

The decree cancelled the promissory note for $14,000 given to defendant by Hickman Insurance Agency, Inc. (formerly Burgoyne Motors), payment of which was guaranteed by plaintiffs. Defendant contends that the decree unnecessarily eliminated a contractual obligation between the defendant and the corporation which was not a party to this case. Defendant asks that the decree be modified to provide for the cancellation of plaintiffs' guaranty of the payment of this note rather than of the note itself. Plaintiffs have consented and the decree will be so modified.

The plaintiffs have cross-appealed seeking to have the decree modified in the following particulars: (1) to

allow plaintiffs their costs in the trial court; (2) to allow interest from August 6, 1954 on the sum of $7,000 to be repaid them by defendant; and (3) to require defendant to repay to plaintiffs the sum of $1,200 advanced by them to the corporation to enable it to open a bank account and start business.

██ The statute (ORS 20.030) directs that costs and disbursements shall be allowed in equity suits to the prevailing party unless the court otherwise directs. Under this statute the trial court may allow or deny costs in its discretion and upon appeal the exercise of such discretion will not be disturbed except for a manifest abuse thereof. *Reeves et al. v. Porta,* 173 Or 147, 157, 144 P2d 493, *Henry v. Henry,* 156 Or 679, 685, 69 P2d 280, and *Cockerham v. First Nat. Bank of Redmond,* 136 Or 176, 185, 287 P 223, 297 P 363. Although we are inclined to think that the trial court should have allowed plaintiffs their costs, we can not say that his refusal to do so in this case was a manifest abuse of discretion.

██ Plaintiffs contend that they are entitled to interest on the down-payment of $7,000 from August 6, 1954, when the complaint was filed instead of from June 22, 1955, when the decree was entered, and cite *Weiss and Hamilton v. Gumbert,* 191 Or 119, 227 P2d 812, 228 P2d 800. See also *Widmer v. Leffelman,* 196 Or 401, 249 P2d 476 and *Schuler v. Humphrey,* 198 Or 458, 257 P2d 865. Under the rule of the above cases, plaintiffs would be entitled to interest from the date they rescinded the contract and demanded a return of the money paid thereon. In this case, notice of rescission was given and demand made by filing this suit. However, plaintiffs' amended complaint contained no prayer for interest and there is nothing in the record to indicate that this item was ever called to the atten-

tion of the trial court. It is true that in a suit in equity a prayer for general relief authorizes the court to enter such a decree as may properly be given under the allegations of the complaint. *Monese v. Struve,* 155 Or 68, 81, 62 P2d 822, and earlier cases there cited. Although we have authority to do so, we see no reason to modify the decree in this case to allow interest from the filing of the complaint when the claim for interest is asserted for the first time on appeal.

■ We think the trial court should have entered judgment against defendant for the additional sum of $1,200 paid by plaintiffs to defendant at his suggestion to enable the corporation to open a bank account. When the contract was signed plaintiffs gave defendant a draft for $8,200. Of this amount $7,000 was retained by defendant as the down-payment and the balance of $1,200 was paid by defendant's check to the corporation. Plaintiffs drew nothing from the corporation at any time. All of the stock of the corporation was surrendered to defendant when this suit was filed and he thus received the full benefit of this advance. In *Epton v. Moskee Investment Co. et al.,* 180 Or 86, 93, 174 P2d 418, this court said: "It is well settled that, when corporate entity is used to accomplish fraud or injustice, the courts will disregard it, and will look through the corporate form to the real actor or actors in the transaction. (citing authorities)" See also *McIver v. Norman,* 187 Or 516, 537, 205 P2d 137, 213 P2d 144. The decree will be modified to include a judgment against defendant for this additional sum of $1,200 with interest from the date the decree was entered.

As herein modified, the decree is affirmed.

Plaintiffs are allowed their costs in this court.