## IN THE OREGON TAX COURT

## PORTLAND GENERAL ELECTRIC COMPANY
*v.*
## DEPARTMENT OF REVENUE
(TC 2542)

Roger K. Harris and Julie A. Keil, Portland General Corporation, Portland, represented plaintiff.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered September 8, 1988.

## CARL N. BYERS, Judge.

Plaintiff appeals from defendant's Opinion and Order No. 84-5566 increasing plaintiff's 1981 corporate tax liability. The appeal concerns two deficiency assessments arising from the same transaction, one for Oregon Corporate Excise Taxes and one for Multnomah County Business Income Taxes.

The facts appear deceptively simple. In 1981, plaintiff received a cash payment from another corporation in exchange for the right to use some of plaintiff's federal tax benefits. The equally simple question is whether that payment is taxable either in part or in full. Some background explanation is required in order to appreciate the many facets associated with this question.

The Economic Recovery Tax Act of 1981 provided for what is commonly known as Safe Harbor leasing. This was an effort by Congress to stimulate capital investment and promote growth in the nation's economic base. By enacting IRC § 168(f)(8)(1981), Congress allowed one company to use a lease in form only to transfer its tax benefits to another taxpayer. This was a major departure from traditional tax rules. Traditionally, economic realities or the substance of a transaction determined its tax consequences. Safe Harbor leasing, however, elevated form over substance so that there was no pretense of requiring a true lease. The subject transaction, which the parties stipulate constitutes a valid Safe Harbor lease, is a good example.

Prior to 1981, plaintiff experienced some net operating losses which it carried forward for deduction in future years. Those losses would substantially delay realization of the federal tax benefits associated with the equipment plaintiff purchased in 1981. In fact, plaintiff acknowledged that there was "significant" risk that some of its tax benefits might expire before they could be used. Accordingly, plaintiff elected to take advantage of the Safe Harbor leasing provisions by selling the equipment purchased in 1981 to Atlantic Richfield Company (ARCO) and then leasing it back. Plaintiff "sold"

$39,347,430.67 of equipment to ARCO at plaintiff's cost. The transaction was structured so that ARCO paid plaintiff $10,572.651.54 as a cash "down" payment and then executed four promissory instalment notes for the balance of $28,774,779.13. At the same time, plaintiff executed four separate leases leasing the equipment back from ARCO. The lease payments under the four leases exactly offset the amounts ARCO was obligated to pay plaintiff under the instalment notes. The only difference appears to be that at the end of the lease period, plaintiff was required to pay ARCO the sum of $1 to repurchase the equipment. The parties have stipulated "there was no actual or legal transfer of ownership of the leased properties" and there is no indication that the parties even went through the motions of making the offsetting payments.

In substance, ARCO paid plaintiff approximately $10 million dollars for the right to use federal income tax benefits associated with the ownership and use of approximately $39 million dollars of tangible property. Except for the Safe Harbor leasing rules, such a transaction would have been laughed out of a tax forum. Even the Safe Harbor leasing provisions recognize that such a lease is treated as such "solely" for federal income tax purpose.

Although Congress provided special rules for federal income taxes, it made no direct provision for the consequences to be realized by such a transaction under state income tax laws. In 1981, the year in issue, Oregon's corporate excise tax laws were patterned after the federal Code but not tied directly to it. That is, ORS chapter 317 contained state definitions of gross income, adjustments and taxable income. As a consequence, defendant asserted a tax on the payment made by ARCO to plaintiff. This was done on the rationale that the payment fell within the definition of gross income then contained in ORS chapter 317 and that there was no other provision expressly providing for its exclusion or deduction. Defendant allowed no basis to be allocated to the payment but treated all of the payment as gain. This resulted in imposition of approximately $809,946 in additional excise and Multnomah County Business Income Tax liabilities.

Is the cash payment taxable? Plaintiff contends not, on several grounds. First, plaintiff argues that the Oregon

legislature never intended to tax such payments either before or after the passage of Oregon Laws 1983, chapter 162, section 25. Second, plaintiff contends that the character and nature of the payment make it a federal tax benefit which is not taxable by Oregon. Finally, plaintiff argues that taxing the payment would violate various provisions of the Oregon Constitution and constitute double taxation.

As mentioned above, Congress approved the Safe Harbor leasing in 1981 without specifically dealing with the issue of state income taxation. As a result, Safe Harbor leases were a "hot" issue when Oregon's 1983 Legislature convened. After some study, that legislature adopted chapter 162, section 25, which provides:

> "To derive Oregon taxable income, federal taxable income shall be modified to the extent necessary to not treat as a lease purchase or in any other way recognize for Oregon tax purposes a transaction entered into pursuant to section 168(f)(8) of the Internal Revenue Code."

Plaintiff's basic argument is that the 1983 Legislature intended section 25 to apply to all Safe Harbor leases, both before and after 1983. Plaintiff maintains that not only did the legislature intend section 25 to be retroactive, it was also a restatement of the existing tax law.

Plaintiff's brief cites minutes and comments from the legislative history to support its view. The problem is that legislative history may be resorted to only if there are ambiguities or questions in the statutes themselves. *Whipple v. Howser,* 291 Or 475, 632 P2d 782 (1981). The first question that must be asked is whether there is any ambiguity or doubt as to the effective date of section 25. The answer to that question is no, since section 58 expressly provides:

> "Except as specifically provided otherwise, the amendments, repeals and new matter contained in sections 1 to 57 of this Act apply to taxable years beginning on or after January 1, 1983. For all prior taxable years, the law applicable for those years shall remain in full force for the purposes of assessment, imposition and collection of corporation excise and income taxes and for all interest, penalties or forfeitures that have accrued or may accrue with respect to those taxes."

Plaintiff argues strenuously that section 25 is merely a restatement of Oregon's prior law and points to section 41 of the Act as evidence.[1] Section 41 provides:

> "Insofar as the provisions of sections 2, 11 to 28 and 37 to 41 of this 1983 Act are substantially the same as existing law relating to the taxation of corporations, they shall be construed as restatements and continuations, and not as new enactments."

The court acknowledges an ambiguity is present in that the term "insofar" can be read to mean "inasmuch" or it can be read to mean "to the extent." If interpreted as meaning "inasmuch," then the legislature viewed the enumerated sections as being substantially the same as the existing laws. On the other hand, if it is interpreted to mean "to the extent," then the legislature intended some changes in the law. Despite the fact that the section makes more sense if read as "inasmuch" than "to the extent," the court believes that it is the latter position that must be adopted.[2] The reason for the court's conclusion is its finding that section 25 is not merely a restatement of prior Oregon law.

Prior to 1983, no Oregon tax statute expressly addressed the problem of Safe Harbor leases. What was the law that would apply and which plaintiff says was the same as section 25? The point apparently had not been ruled on in Oregon. By analogy, one must come to the conclusion that a lease arrangement similar to that involved here would have been treated as a sham transaction. The doctrine of sham transaction was developed by the courts to prevent taxpayers from using labels and forms to avoid the intent and force of the income tax laws. *See Gregory v. Helvering,* 293 US 465, 55 S Ct 266, 79 L Ed 596 (1935) [35-1 US Tax Cas (CCH) ¶ 9043]. It is necessary to explore this doctrine in order to determine if it was the same as section 25.

The basic premise of the sham transaction doctrine is that, for purposes of income taxes, all transactions are to be judged by their substance rather than their form to determine

---

[1] Plaintiff's argument is weakened by its correct observation that "there was no clear statement of prior Oregon law or policy on SHLs." Plaintiff's Reply Brief, at 5.

[2] The latter reading in effect has the legislature stating that to the extent the enumerated sections are the same as existing laws they are the same as existing laws.

their tax effects. For example, in *James v. Commissioner,* 87 TC 905 (1986), a joint venture purported to purchase certain computer equipment from a related company. The equipment was already subject to existing leases. The purported seller of the equipment managed the leases for the joint venture. The court found that under the most optimistic expectations the joint venture could not anticipate any profit from the transaction. In finding that the transactions were totally without economic substance, the court stated:

> "The joint ventures acquired no interest in the computer equipment or the leases covering that equipment. Instead, the joint ventures merely purchased a package of tax benefits from CALI." *Id.,* at 924-25.

As the court explained in *Rice's Toyota World, Inc. v. Commissioner,* 752 F2d 89, 91 (4th Cir 1985) [85-1 US Tax Cas (CCH) ¶ 9123]:

> "To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists."

When the court finds that a transaction is a sham, it will disregard all aspects of the transaction lacking economic substance. This means, for example, that if a real estate transaction is viewed by the court as a sham, it may deny the taxpayer a cost basis in an asset actually transferred to it. *See Decon Corp. v. Commissioner,* 65 TC 829 (1976), and *National Lead Co. v. Commissioner,* 336 F2d 134, 141 (2d Cir 1964), *cert den* 380 US 908, 85 S CT 889, 13 L Ed 2d 795 (1965).

■ As the United States Tax Court noted in *Rice's Toyota World, Inc. v. Commissioner,* 81 TC 184, 207 (1983):

> "Under the sham transaction theory by which we disregard the transaction in its entirety, it follows that the 'cash investment' is also not properly includable in taxpayer's basis. Since petitioner was not making an actual investment in an asset, the transaction presents no opportunity other than for tax reduction. The cash down payment, therefore, must be viewed as a fee for purchasing tax benefits."

However, to the extent that a sham transaction contains some element of economic substance, that substance must be recognized. In partially overruling the United States Tax Court, the

Court of Appeals in *Rice's Toyota World, Inc. v. Commissioner,* 752 F2d 89, 96, [85-1 US Tax Cas (CCH) ¶ 9123] (1985) said:

> "*Grodt* itself recognized that a sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded."

The sham transaction doctrine was developed by the federal courts for purposes of the federal income tax law. The Oregon Legislature, as a matter of policy, has patterned Oregon's income tax laws after federal law with the intent:

> "[T]o simplify demands on taxpayers by bringing our income and excise tax laws in substantial conformity with corresponding provisions of the federal law when such could be accomplished without sacrifice to legislative independence and yet retain certain distinct and different features from the federal code." *Ruth Realty Co. v. Tax Commission,* 222 Or 290, 294, 353 P2d 524 (1960).

In light of this policy, this court is convinced that prior to the enactment of section 25, a lease arrangement such as involved in this case would have been treated by Oregon courts as a sham transaction.[3] Thus, contrary to plaintiff's contentions, section 25 does not incorporate the same treatment as would flow from the finding of a sham transaction. Section 25, by its plain language, ignores *all* aspects of a Safe Harbor lease arrangement regardless of whether any element of that arrangement has economic substance or not. In essence, the legislature has declared that a Safe Harbor lease will be without any economic substance for purposes of Oregon income tax. This is not the same as the sham transaction doctrine.

Finding that section 25 is neither retroactive nor a restatement of existing Oregon law, the question is: How would Oregon treat a federally approved Safe Harbor lease prior to 1983?

When Congress enacted IRC § 168(f)(8)(1981), it made it possible to actually transfer federal tax benefits. Congress thereby imbued such transactions with economic substance. Analyzing the transaction on the basis of its substance

---

[3] It should be noted that except for the existence of IRC § 168(f)(8)(1981), the parties would not have entered into such a transaction since it clearly would fail to qualify as a valid sale-lease-back arrangement.

rather than its form, plaintiff sold certain rights associated with its tangible personal property to ARCO for cash. However, those rights pertained only to the federal income tax laws and not to Oregon's corporate tax laws. As to Oregon, that element of the transaction was not a sham. In the court's view, it is no different than if plaintiff sold its right to a federal grant or subsidy or some other government benefit. This was not an arrangement whereby the taxpayers hire a strawman or set up dummy corporations or trusts whose forms create shadows complying with the tax laws but which are devoid of economic substance. *Zmuda v. Com.,* 731 F2d 1417 (9th Cir 1984) [84-1 US Tax Cas (CCH) ¶ 9442] (affirming 79 TC 714). Rather, the transaction between plaintiff and ARCO was an arm's-length transaction negotiated by the parties to establish a price which was paid in cash. It is true that the overall form of the transaction was not a sale of tax benefits, but the sale and leaseback of equipment. However, the form was not a matter of choice, being dictated by federal law.[4] Moreover, that element of the transaction containing economic substance, *i.e.* the sale of tax benefits, is adequately reflected in the form of the transaction. All other aspects of the transaction may be disregarded as a sham transaction without economic substance.

In summary then, the court finds that the sale and leaseback arrangement entered into by plaintiff and ARCO was, with one exception, without economic substance and should be ignored for purposes of Oregon corporate excise taxes. The one element of the transaction which has economic substance and should be recognized by Oregon is the sale by plaintiff of its rights to certain federal deductions and tax credits to ARCO in exchange for the cash payment.

Concluding that section 25 of the Act does not apply and that the existing Oregon law was different from section 25, the court must then consider the tax status of the payment received by plaintiff.

Plaintiff maintains that the payment was either a nonrecognizable refund of federal income taxes or an exempt

---

[4] From one point of view the manner by which the tax benefits are transferred should not be important. *See* for example, Warren & Auerbach, *Transferability Of Tax Incentives And The Fiction Of Safe Harbor Leasing,* 95 Harv L Rev 1752 (1982).

federal tax subsidy or benefit. The court finds that it was neither. The payment was not a refund because a refund is a return of money from the government. The term "refund" means to recover or receive back money which had been previously paid to the government. *US v. Woodmansee,* 388 F Supp 36, 46 (1975). Plaintiff never paid the $10 million dollars to the government and the money was not returned from the government. The money was a payment from another corporation made to plaintiff in exchange for certain rights of plaintiff associated with plaintiff's property. Moreover, the transaction was not only conditioned on plaintiff maintaining the property in service but also plaintiff would have to pay the money back to ARCO if the IRC or regulations were amended to disallow the anticipated tax benefits.

Likewise, the payment is not a federal subsidy but payment from another taxpaying corporation. Even if it were viewed as an indirect subsidy, it would not be exempt from taxation. Both parties acknowledge in their briefs that Oregon's definition of gross income for ORS chapter 317 is as broad as the federal definition of gross income. The court is unable to find any state law exempting federal payments or subsidies from taxation by Oregon. Likewise, the court knows of no general federal exemption, either legislative or constitutional, that precludes taxation by Oregon. There are too many cases which make it clear that even direct payments from the government can be taxed by the states. *See Kennecott Copper Corporation v. State Tax Commission,* 116 Utah 556, 212 P2d 187 (1949); *McManus v. Dept. of Rev.,* 91 Wis 2d 682, 283 NW2d 576 (1979); and *Salt Lake County v. Kennecott Copper Corp.,* 163 F2d 484 (10th Cir 1947) *cert den* 333 US 832, 68 S Ct 458, 92 L Ed 1116 (1947).

Defendant maintains that the payment is entirely taxable gain from the sale of an intangible in which plaintiff had no basis. Defendant cites *Copperhead Coal Co. v. Commissioner,* 272 F2d 45 [60-1 US Tax Cas (CCH) ¶ 9108] and *H & R Distributing Co. v. Commissioner,* 31 TCM (CCH) 1014. Those cases are not applicable. The court cannot accept defendant's position because it would require viewing the federal tax benefits as intangible assets completely separate and independent of the tangible personal property involved. Investment tax credits and deductions for depreciation (ACRS) cannot be separated from ownership of the tangible property. If they

could be separated there would be no need for a Safe Harbor lease since it is "ownership" of the property which allows ARCO to claim those tax benefits.

> "Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property." *Merrill v. Commissioner,* 40 TC 66, 74 (1963).

One of defendant's reasons for contending that federal tax benefits have no basis is because it would be impractical and contrary to Oregon law to allocate basis to federal tax benefits at the time of purchasing the property. Allocation of basis at the time of purchasing property for purposes of depreciation is not the only time or purpose allocations are made. Basis may be allocated long after purchase when computing gain on the sale of a portion of the property. For example, there is no requirement that the cost basis of real estate be allocated with regard to potential easements, development rights or other ownership elements until such time as those sticks are sold or disposed of from the bundle. *See* Rev Rul 77-414, 1977-2 CB 299 and *Watts, et al v. Erickson,* 10 AFTR2d (P-H) 5832, (D Oregon 1962), 62-2 US Tax Cas (CCH) ¶ 9778.

Under Oregon corporate excise tax law existing prior to January 1, 1983, the taxpayer would not know if gain was realized under OAR 150-317.160-(F) until determined under OAR 150-317.210-(A). The relevant part of OAR 150-317.210-(A), which is basically the same as the federal regulation, provides:

> "Where property is acquired as a whole without segregation into units and a part of it is subsequently disposed of, ordinarily gain or loss is to be computed on the part disposed of and not held in abeyance until the entire basis is recovered, and a proper portion of the basis is accordingly allocated to the part sold."

However, if it is "practically impossible" to apportion the cost, a taxpayer is entitled to treat the proceeds from the sale of a portion of the property as a recovery of capital up to the amount of his adjusted basis in the property. Rev Rul 79-276, 1972-2 CB 200. For example, in *Inaja Land Co. v. Commissioner,* 9 TC 727 (1947), the taxpayer sold a "portion" of his real property in the form of a flooding easement which permitted flooding of portions of his property. Since the tax

court found that it was impossible to allocate the easement to any particular part of the property, it allowed the taxpayer to report the proceeds from the sale of the easement as a recovery of basis. *See also Fasken v. Commissioner,* 71 TC 650 (1979); *Piper v. Commissioner,* 5 TC 1104 (1945); and Rev Rul 70-510, 1970-2 CB 159.

Here it is impossible to allocate a portion of plaintiff's adjusted basis in the equipment to the federal tax benefits associated with the ownership and use of that equipment. The economic realities are that plaintiff has managed to recover a portion of its capital invested in the equipment by selling the federal tax benefits associated with that equipment.

> "To avoid the double taxation of income, the concept of basis evolved. It provides a means to distinguish between amounts which have already been taxed or are exempt from tax and those amounts which have not been taxed because the gain or loss has not yet been realized." 3 Mertens, *Law Of Federal Income Taxation,* § 21.01, at 11.

■ By viewing the payment received by plaintiff as recovery of basis, plaintiff's adjusted basis in the equipment for purposes of state and local taxation in Oregon will be reduced accordingly. This will diminish plaintiff's depreciation deductions for Oregon. From an economic analysis point of view, plaintiff has simply reduced its cost of the equipment by the amount of the cash payment. This being the case, plaintiff's claims of double taxation, violation of the commerce clause and other constitutional violations need not be addressed. Defendant's Opinion and Order No. 84-5566 will be set aside and judgment will be entered consistent with this opinion.

Plaintiff to recover its costs and disbursements incurred herein.

## OPINION ON COST BILL

Roger K. Harris, Portland General Corporation, Portland, represented plaintiff.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Opinion rendered November 23, 1988.

## CARL N. BYERS, Judge.

This matter is before the court on defendant's objection to plaintiff's cost bill. Plaintiff prevailed in its suit for a refund of corporate income taxes[1] and the court in its Opinion held that plaintiff is entitled to recover its costs and disbursements. Plaintiff duly submitted a cost bill in the amount of $44,799.15. Most of the costs incurred were attributable to plaintiff's use of three experts in preparing for the trial, two of whom testified as expert witnesses at trial.

Defendant objects to plaintiff's cost bill on several grounds: (1) corporate taxpayers are not entitled to recover "reasonable expenses," (2) costs and disbursements do not

---

[1] The taxes in dispute and to be refunded also include Multnomah County Business income taxes.

include attorney fees or expert witness fees, (3) the claimed expenses are not reasonable or necessary, and (4) the services rendered were really in the nature of legal services and, therefore, should not be recoverable. At the hearing, plaintiff put on evidence as to the reasonableness of the experts' fees, contending that the amount is not unreasonable when compared to the refund of approximately $1.2 million anticipated as a result of prevailing in the suit.

■　　Although the Tax Court has the same powers as a circuit court and can exercise the same remedies (ORS 305.405(2)), the legislature has provided a specific statute for cases before the Tax Court. ORS 305.490(1) requires taxpayers filing cases in the Tax Court to pay specified filing fees. The latter portion of that subsection provides:

> "The party entitled to costs and disbursements on such appeal shall recover from the opponent of the party the amount so paid upon order of the court, as in equity suits in the circuit court."

The court interprets this to mean that Tax Court filing fees are recoverable as part of a party's costs and disbursements just as in the circuit courts. The statute does not limit costs and disbursements to filing fees only.

■　　Addressing the larger issue is ORS 305.490(2) which provides:

> "If, in any proceeding under this section involving taxes upon or measured by net income in which an individual taxpayer is a party, * * * the court may allow the taxpayer, in addition to costs and disbursements:
>
> "* * * * *
>
> "(b)　Reasonable expenses as determined by the court. Expenses include accountant fees and fees of other experts incurred by the executor or individual taxpayer in preparing for and conducting the proceeding under this section and the prior proceeding in the matter, if any, before the department."

Plaintiff's arguments for recovery of its expenses reduce down to two basic contentions, the first of which is that plaintiff is entitled to recover its "reasonable expenses" under ORS 305.490(2)(b). Defendant objects on the grounds that plaintiff is a corporation and not an "individual taxpayer" as required by the statute. In answer, plaintiff argues that the

term "individual taxpayer" is not defined in ORS chapter 305. Plaintiff points out that although ORS 316.022 defines "individual" as a natural person, that section limits the definition to "[a]s used in this chapter." Plaintiff further cites cases where the courts have used the term "individual taxpayers" in referring to corporate taxpayers.

■ Despite plaintiff's arguments, the court is persuaded that the term "individual taxpayer" as found in ORS 305.490(2) is intended to mean only natural persons as defined in ORS 316.022. ORS 316.022 does not indicate that the definitions contained therein are limited solely to ORS chapter 316. Moreover, the common, ordinary meaning of "individual taxpayer" would be a natural person. If the term "individual" is not so intended, then its insertion in the statute is meaningless surplusage. If a single corporate taxpayer is an individual taxpayer, as plaintiff contends, then the legislature would have simply said "taxpayer." It is unreasonable to believe that the legislature was attempting to limit the recovery to cases where there was only one taxpayer as opposed to two or more taxpayers. Moreover, if plaintiff, as a corporate taxpayer, qualifies under ORS 305.490(2)(b) to recover reasonable expenses it would also qualify for the recovery of its reasonable attorney fees. Plaintiff has made no claim or contention for such amounts.

Plaintiff argues that this court previously allowed recovery of attorney fees under ORS 305.490 in cases involving a corporate taxpayer, citing *Martin v. Dept. of Rev.,* 9 OTR 100 (1981), *rev'd* 294 Or 180, 655 P2d 168 (1982). That case involved a suit for refund of excess paid withholding taxes. The plaintiffs in that case were Martin's Foodliner, Inc., an Oregon corporation, and Marvin Martin, the sole owner of the corporation. In awarding plaintiffs their attorney's fees in addition to their costs and disbursements, the court commented in footnote 34:

> "ORS 305.447(1) provides for attorney fees when plaintiff prevails in certain income tax cases. This suit is a case "involving taxes upon or measured by net income in which an individual taxpayer is a party" (as required by ORS 307.447's first paragraph). Mr. Martin is a necessary party to this suit because, as officer and bookkeeper, he was personally liable for state withholding taxes under ORS 316.162(3)(b)." *Martin v. Dept. of Rev.,* 9 OTR 100, 111 (1981).

Except for the fact that the individual taxpayer was a party plaintiff, the court would not have allowed attorney's fees under that statute.

Plaintiff's second basic contention is that the claimed expenses are recoverable under ORCP 68, adopted by the Tax Court as part of its rules "to the extent applicable." The relevant portions of that rule are as follows:

"A.   Definitions. As used in this rule:

"A.(1)   Attorney Fees. 'Attorney fees' are the reasonable value of legal services related to the prosecution or defense of an action.

"A.(2)   Costs and Disbursements. 'Costs and disbursements' are reasonable and necessary expenses incurred in the prosecution or defense of an action other than for legal services, and include the fees of officers and witnesses; the expense of publication of summonses or notices, and the postage where the same are served by mail; the compensation of referees; the necessary expense of copying of any public record, book, or document used as evidence on the trial; a reasonable sum paid a person for executing any bond, recognizance, undertaking, stipulation, or other obligation therein; and any other expense specifically allowed by agreement, by these rules, or by other rule or statute. The expense of taking depositions shall not be allowed, even though the depositions are used at trial, except as otherwise provided by rule or statute.

"B.   Allowance of Costs and Disbursements. In any action, costs and disbursements shall be allowed to the prevailing party, unless these rules or other rule or statute direct that in the particular case costs and disbursements shall not be allowed to the prevailing party or shall be allowed to some other party, or unless the court otherwise directs. If, under a special provision of these rules or any other rule or statute, a party has a right to recover costs, such party shall also have a right to recover disbursements."

In examining the above language, the reader should be aware that there are limitations as to the expenses recoverable which may not be apparent. It should be noted that the terms "costs" and "disbursements" were once clearly distinguished.

"Costs are certain sums to be allowed to the prevailing party in the judgment or decree, by way of indemnity for his attorney's fees in maintaining the action or suit or defense thereto:

Or. L., § 561. Disbursements, on the other hand, are the necessary expenses connected with the prosecution or defense of the litigation: Or. L., § 566. * * * [T]he distinction between 'costs' and 'disbursements' has not always been observed, but the fact is, that the two are entirely distinct, * * *." *In Re Will of Pittock,* 102 Or 159, 199, 199 P 633 (1921).

■ It has long been the rule that the recovery of costs and disbursements is allowed only by virtue of statutory authority, there being no right to such recovery at common law. *Wood v. Fitzgerald,* 3 Or 568 (1870). Moreover, a party was not allowed to recover disbursements unless he was allowed to recover costs. Probably it was this relationship which resulted in the use of the terms jointly. *See* footnote in *Gowin v. Heider,* 237 Or 266, 321, 386 P2d 1, 391 P2d 630 (1964). A quick review of the current sections contained in ORS chapter 20 readily discloses that the terms are now used as one concept.

■ The point of all this is that ORCP 68 *"does not change the 'items recoverable as disbursements' under the former statutes." Hancock v. Suzanne Properties, Inc.,* 63 Or App 809, 814, 666 P2d 857 (1983). In that case the Court points out that:

"The definition of recoverable 'costs and disbursements' contained in ORCP 68A(2) does not include expert witness fees. It allows 'fees for officers and witnesses,' as did former ORS 20.020. Unless otherwise expressly allowed by statute, *see e.g.,* ORS 20.098; *Welch v. U. S. Bancorp, supra,* witness fees are limited to $5 per day. ORS 44.410." *Id.,* at 815.

Likewise, the prevailing party is not allowed to recover mileage for travel outside Oregon. *Stoll v. Curl,* 275 Or 487, 551 P2d 1058 (1976).

Plaintiff argues that reasonable expenses paid for expert witnesses are allowable when necessary to the case, citing *American Timber v. Niedermeyer,* 276 Or 1135, 558 P2d 1211 (1977). The opinion in that case does not clearly indicate the basis for the court's award. However, it appears that the issue on appeal was not the awarding of such fees but the amount allocated in that particular suit. If so, it would be reasonable to conclude that the court, in an equity suit, allowed recovery of the amounts in order to accomplish the

ends of justice. While that case is not clear, there is subsequent authority which is clear. In *Welch v. U.S. Bancorp,* 286 Or 673, 709-10, 596 P2d 947 (1979), the trial judge refused to allow disbursements for depositions not read at the trial and for expert witness fees, both of which the Supreme Court indicated were:

> "[N]ecessary in every sense of the word to prepare the case for trial * * * and to present it at trial. The statutes do not permit recovery of such disbursements. Until the legislature acts to allow such disbursements the courts are powerless to compensate parties for such items."

The Tax Court statute specifically addresses the type of accountant and consultant fees plaintiff incurred in this case. ORS 305.490(2). The problem is plaintiff does not qualify under that statute. If this court were to construe ORCP 68 to allow recovery of expert witness fees, it would not be limited to income tax cases. To permit the recovery of expert witness fees in property tax cases where expert witnesses abound would be a major change. Also, to construe ORCP 68 so liberally would, in effect, override the limitations of ORS 305.490. None of these consequences can be viewed as reasonably intended or expected by the legislature.

Even if the major expenses claimed by plaintiff were within ORCP 68, the court would not allow plaintiff to recover them as part of its costs and disbursements. The award of costs and disbursements is entirely discretionary with the court. *Ruth et ux v. Hickman,* 214 Or 490, 330 P2d 722 (1958). Defendant argues, and the court agrees, that the only issues of significance in this case were legal issues. The experts used by plaintiff and called as witnesses were not necessary or of assistance in resolving those major issues. Specifically, the testimony of Corrick and Carlson were directed at plaintiff's theories regarding nontaxability of tax benefits, discrimination and burdens on interstate commerce. The dispute was not resolved in plaintiff's favor on those issues and, most importantly, it was resolved on legal principles, not facts.

After examining plaintiff's cost bill, and in accordance with the above, the court finds that the following costs and disbursements are allowable:

| | |
|---|---:|
| Filing Fee | $ 10.00 |
| Oregon Dept. of Revenue, copying of cassettes from legislative hearings | 141.00 |
| Copies of legislative history | 23.40 |
| Copies of Senate and House cassette tapes for 1983 legislative session | 65.77 |
| Copies of Senate and House cassette tapes for 1983 legislative session | 16.24 |
| Copies of legislative history from state archives | 18.15 |
| Trial Fee | 100.00 |
| Prevailing Fee | 60.00 |
| Total: | $ 434.56 |

The clerk will enter the total amount in the judgment.